## DELL CATALOG SALES, L.P. *v.* COMMISSIONER OF REVENUE SERVICES

Superior Court, Judicial District of New Britain
File No. CV-00 0503146S

Memorandum filed July 10, 2003

*Cummings & Lockwood*, for the plaintiff.

*Paul M. Scimonelli*, assistant attorney general, with whom was *Richard Blumenthal*, attorney general, for the defendant.

HON. ARNOLD W. ARONSON, JUDGE TRIAL REFEREE. The plaintiff, Dell Catalog Sales, L.P. (Dell Catalog Sales), filed this appeal pursuant to General Statutes § 12-422 from a decision by the defendant, the commissioner of revenue services (commissioner), sustaining assessments of sales and use tax against Dell Catalog

Sales. The commissioner, after an audit, assessed a sales and use tax against Dell Catalog Sales for the period November 1, 1993, through December 31, 1998, based on a finding that Dell Catalog Sales had a physical presence or nexus in Connecticut for the purpose of collecting a sales or use tax from its customers in this state.

Dell Catalog Sales claims that it conducts a national mail order business that operates exclusively through interstate commerce and, therefore, it cannot be compelled to collect a sales or use tax on mail order sales made to residents of a state in which the seller has no physical presence. Dell Catalog Sales cites *Quill Corp.* v. *North Dakota,* 504 U.S. 298, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992), *National Bellas Hess, Inc.* v. *Dept. of Revenue,* 386 U.S. 753, 87 S. Ct. 1389, 18 L. Ed. 2d 505 (1967), and *SFA Folio Collections, Inc.* v. *Bannon,* 217 Conn. 220, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991), in support of its claim of nontaxability. Dell Catalog Sales claims that the commissioner concedes that Dell Catalog Sales has no physical presence in Connecticut and that the commissioner's nexus argument is premised solely on the physical presence in Connecticut of a company called BancTec.

As used in the present case, nexus means the connection or physical contacts which an out-of-state vendor has with a state to justify that state's imposition of a duty on the out-of-state vendor to collect a use tax from purchasers. 2 J. Hellerstein & W. Hellerstein, State Taxation (3d Ed. 2000) ¶ 19.02 [1], p. 19-7; see also *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 298.

The issue here is whether Dell Catalog Sales, as an out-of-state vendor of computers, with no physical contacts within the state of Connecticut, can be said to have a nexus to Connecticut by having BancTec provide

a service to Dell Catalog Sales customers under a contract between the customer and BancTec.

Dell Corporation is a holding company with subsidiaries that carry on its day-to-day business. Three of the subsidiaries involved in the present case are Dell Products, L.P., the aforementioned Dell Catalog Sales and Dell USA, L.P. Dell Products, L.P., manufactures computers. Dell Catalog Sales sells the computers manufactured by Dell Products, L.P., and Dell USA, L.P., provides the administrative support for both Dell Products, L.P., and Dell Catalog Sales. Together, these three entities are known as the Dell affiliates.[1] Each Dell affiliate describes itself as "Dell." For the purpose of this memorandum of decision, "Dell" refers only to the holding company.

From 1992 to 1994, Dell, through a subsidiary, Dell Marketing, L.P., sold computers to the government and to businesses at retail. This was not profitable. At the beginning of the 1990s, the personal computer market began exploding. Dell saw that individual consumers had a need from different corporate business users. Dell had a segmented strategy to form new entities to service specific customers. Dell split sales to large business entities from sales to the individual consumer. The reason for this split of business was that the individual consumer was interested in games, graphics and high fidelity audio in addition to normal computer uses. Large business customers wanted to pay for computers on invoices and discounted bills, and individual consumers wanted to pay with credit cards.

The early individual consumers in the computer field were knowledgeable about using computers. In the

---

[1] An "affiliate" has been defined as "a company effectively controlled by another or associated with others under common ownership or control." *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 47 Conn. Sup. 540, 547, 815 A.2d 302 (2003).

early 1990s, less knowledgeable consumers began purchasing more computers. Dell, recognizing that inexperienced consumers would not be comfortable doing their own computer repairs, saw a need to develop a system to service the problems that purchasers would have in the operation of their computers. Dell originally considered servicing the computers it sold to individual consumers, but decided not to go this route because it meant setting up a whole organization to service customers in every state with the attendant problems of purchasing vehicles, equipment, hiring employees and managing a service business nationwide different from selling computers. Dell then considered looking for a business that could service computers on a nationwide basis. From 1989 to 1992, Dell entered into an agreement with Xerox Corporation (Xerox) to service the computers sold by Dell to individual consumers. Dell sold service contracts to consumers under which Xerox would do the repairs. Dell received a commission from Xerox on the sale of these contracts. The servicing of Dell computers was not, however, profitable to Xerox and Xerox walked away from its agreement with Dell.

Dell recognized that in order to enhance its sales, it had to stand behind its product and to provide service to its customers when needed. The ability to provide service to its individual customers was one factor in Dell's growth in the early 1990s. At this point, it is important to set forth additional facts in the present case based on the stipulation of the parties. Dell Catalog Sales was organized in October, 1993, and is a Texas limited partnership with its principal place of business in Round Rock, Texas. As a limited partnership, Dell Catalog Sales has no subsidiaries. Dell is a national mail order business that operates through interstate commerce. Dell sells computers and related products nationwide from outside the state of Connecticut. Dell purchases computers, computer peripherals and

related accessories manufactured by Dell Products, L.P., and other companies such as Hewlett Packard and Iomega, and resells them via national media advertising and mail order catalog from facilities in Round Rock, Texas. Dell Products, L.P., maintains an inventory in Austin, Texas, not in Connecticut.

During the audit period from November 1, 1993, to December 31, 1998, Dell Catalog Sales conducted and coordinated all of its activities exclusively from Texas. It solicited orders through national media advertising and by sending catalogs to prospective customers nationwide, including customers in Connecticut. These catalogs were not designed, prepared, printed, published or mailed from Connecticut. Customers placed orders by contacting Dell Catalog Sales directly in Round Rock, Texas, through the Internet or by telephone, facsimile, mail or e-mail. Customer orders are accepted by Dell Catalog Sales in Round Rock and then shipped from Texas by common carrier or the United States Postal Service. Dell Catalog Sales made no local deliveries in Connecticut, nor did it drop ship merchandise from Connecticut manufacturers. Dell Catalog Sales did not own or operate retail stores anywhere, including Connecticut. Dell Catalog Sales did not have or maintain within the state of Connecticut, directly or by a subsidiary, an office, distribution house, sales house, warehouse or other place of business. Dell Catalog Sales did not own or lease real or personal property in Connecticut. Dell Catalog Sales did not conduct credit investigations or collections in Connecticut.

Dell Catalog Sales had no employees in Connecticut, nor did it solicit sales by employees, independent contractors, agents or other representatives in Connecticut. Dell Catalog Sales did not solicit orders for tangible personal property by means of telephone, telegraph, computer data base, cable, optic, microwave or other communication system located in Connecticut. Dell

Catalog Sales did not enter into contracts with cable television operators located in Connecticut, nor did it advertise only in Connecticut via cable television.

Dell Catalog Sales did not have bank accounts in Connecticut; its credit card clearinghouse is located in Florida. Dell Catalog Sales did not retain security interests in any products sold to Connecticut residents. Dell Catalog Sales did not use Connecticut vendors to design, prepare, print, store or mail catalogs. Dell Catalog Sales did not enter Connecticut to purchase, place or display advertising for itself or others. Dell Catalog Sales did not advertise, pursuant to a contract with radio or television media or a newspaper or magazine publisher located in Connecticut. Dell Catalog Sales did not send orders to a Connecticut manufacturer, processor, repairer or printer to be processed and stored in completed form awaiting shipment to customers. Dell Catalog Sales did not have local telephone service in Connecticut with local listings, nor did it have any franchisee or licensee operating under its trade name in Connecticut.

Since Dell Catalog Sales is not a manufacturer, it does not provide any warranties on its sales of computers and related products. The manufacturers of computer and related products such as Dell Products, L.P., Hewlett-Packard and Iomega provide their own manufacturers' warranties.

In addition to the warranty by the manufacturer, customers of Dell Catalog Sales are given the opportunity to purchase, through Dell Catalog Sales, a service contract to be performed by BancTec USA, Inc., a Delaware corporation with its principal place of business in Dallas, Texas. During the audit period, BancTec was a wholly owned subsidiary of BancTec, Inc., a New York Stock Exchange company headquartered in Dallas, Texas. Neither Dell Catalog Sales nor any other Dell

affiliate entity had any ownership interest in BancTec, nor did BancTec have any interest in any Dell affiliate.

BancTec was a small, unknown service company with prior experience servicing bank automated teller machines and repairing computers, looking for national exposure. Dell was a company that could provide Banc-Tec national exposure as well as give it credibility. BancTec wanted the exclusive right to repair Dell computers, but also wanted the right to service computers of other companies besides Dell. Dell, however, wanted the exclusive services of BancTec. Dell did not want BancTec to contract with its competitors in the market. Both BancTec and Dell worked out an agreement to deal with each other's concerns expressed in service contract sales brokerage agreements entered into in 1991, 1995 and 1998.

BancTec performed on-site service repairs made under a service contract sold by Dell Catalog Sales throughout the United States and upon dispatch from Dell Tech Support.[2] The process for obtaining service under a BankTec service contract was as follows: the customer of Dell Catalog Sales called in the problem to a toll free number at Dell Tech Support for diagnosis of the problem. At that point, a determination was made on how to handle the problem. If the problem was not one that could be corrected over the telephone, Dell Tech Support logged a service call to BancTec. Once Dell Tech Support contacted BancTec, BancTec was responsible for resolving the problem. Depending on the problem, however, BancTec might contact Dell Tech Support and a technician would assist BancTec. If a customer was not satisfied with the services performed by BancTec, the customer would contact Dell

---

[2] In those situations in which a product manufactured by Dell Products, L.P., did not work properly, the customer was directed to call Dell Customer Technical Support in Round Rock, Texas.

Tech Support. Dell Tech Support would then take the information and send it to BancTec management, which would then be responsible for resolving the issue with the customer.

Dell Catalog Sales customers were not required to purchase a service contract. Approximately 75 percent of its customers, however, did purchase such contracts. A Dell Catalog Sales customer who wanted to purchase a service contract could do so at the same time the customer purchased a Dell computer or, for an increased price, purchase a service contract from Dell Catalog Sales at any time after the purchase of a computer. When a Connecticut customer decided to purchase the service contract, Dell Catalog Sales added the price of the service contract to the customer's invoice, calculated Connecticut sales tax thereon, and collected the price and tax from the customer. Dell Catalog Sales remitted the sales tax on the sale of the service contract to the department of revenue services.

Pursuant to the terms of the service contract sales brokerage agreements of December 18, 1991, July 1, 1995, and September 1, 1998, Dell Catalog Sales retained as a commission the difference between the net revenue and the retail price charged to the customer for each service contract sold. "Net revenue" means the amount of money that is payable to BancTec from the proceeds of the sale of a service contract to a customer on Banc-Tec's behalf, net of credits. "Net of credits" means returned computer merchandise (on which BancTec service contracts were purchased) or canceled BancTec service contracts.

Dell Catalog Sales did not sell service contracts as a stand-alone product. Customers could only purchase such contracts when buying a Dell Catalog Sales computer product.

The parties have further stipulated that the terms of the service contract sales brokerage agreements provided that Dell Catalog Sales would act as BancTec's agent and broker in marketing BancTec's service contracts, and Dell entities would provide certain technical assistance to BancTec in connection with BancTec's service contracts, in exchange for the contract commission.

The parties have also stipulated that the service contract sales brokerage agreements provided that the amount of revenue received by BancTec on each service contract sold was determined by a Dell formula, which, among other things, took into account the number of on-site service calls actually made by BancTec during the previous ninety day period. After Dell USA, L.P., calculated this amount, Dell USA, L.P., provided such amount to BancTec in a monthly lump sum payment. For the period from January, 1996, through December, 1997, BancTec received approximately 10 to 11 percent of the gross revenue collected by Dell Catalog Sales, and Dell Catalog Sales received approximately 90 percent of the gross revenue collected.

Although Dell Catalog Sales was licensed to do business only in Texas, Florida, Kentucky and Nevada, the commissioner took it upon himself to register Dell Catalog Sales for a tax registration number and had a tax registration number assigned to Dell Catalog Sales in Connecticut. Dell Catalog Sales protested the involuntary registration by the commissioner and has never voluntarily registered itself to do business in Connecticut.

The sales and use tax assessment made by the commissioner for the entire audit period was an estimate based on sales figures for Connecticut obtained from Dell Catalog Sales for approximately one month from December 28, 1996, to January 25, 1997.

The commissioner argues that BancTec acted as a representative of Dell Catalog Sales. With BancTec acting as a representative of Dell Catalog Sales in Connecticut to service Dell computers, the commissioner concluded that Dell Catalog Sales had a nexus to Connecticut sufficient to require Dell Catalog Sales to collect sales and use taxes from its customers on the purchase of computers and related products and to remit these taxes to the commissioner. The commissioner relies on the holding in *Scripto, Inc.* v. *Carson*, 362 U.S. 207, 211, 80 S. Ct. 619, 4 L. Ed. 2d 660 (1960), that the characterization of the representative is of no "constitutional significance," be it agent, employer or independent contractor.

The commissioner's position is supported by the stand taken by the multistate tax commission. "At the end of 1995, the Multistate Tax Commission . . . working together with 26 states, issued Nexus Program Bulletin 95-1. The bulletin set forth the position that an out-of-state vendor of computers generally has nexus for sales and use tax and income tax purposes with the market state if the vendor contracts with a third party to provide the purchasers with repair services for their computers under the vendor's warranty." R. Pomp & M. McIntyre, "State Taxation of Mail-Order Sales of Computers After *Quill*: An Evaluation of MTC Bulletin 95-1," 2 State and Local Taxation (R. Pomp & O. Oldman eds., 3d Ed. Rev. 2000) p. 9-58.

Professors Pomp and McIntyre see the issue posed by the stand of the multistate tax commission as "whether an independent enterprise constitutes a service representative of a seller of computers if that enterprise provides repair services for the seller's in-state customers under a contractual arrangement with the seller." Id.

Two United States Supreme Court cases, *Scripto, Inc.* v. *Carson*, supra, 362 U.S. 207, and *Tyler Pipe*

*Industries, Inc.* v. *Dept. of Revenue,* 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987), "make it clear that nexus over an out-of-state seller may be established by the activities of unrelated third parties who act on behalf of the seller in the state. What remains unclear is the extent to which activities of independent contractors in a state will subject an out-of-state seller to use tax collection responsibilities." 2 J. Hellerstein & W. Hellerstein, supra, ¶ 19.02 [2] [a], p. 19-11. Both Hellersteins and the commissioner focus on the activities of the independent contractor located in the taxing state acting on behalf of the out-of-state retailer as a basis for finding nexus in the taxing state. This focus is consistent with the holding in *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 298.

In *Scripto, Inc.* v. *Carson,* supra, 362 U.S. 211, the plaintiff, Scripto, Inc., had ten "wholesalers, jobbers, or 'salesmen' conducting continuous local solicitation in Florida and forwarding the resulting orders from that State to Atlanta for shipment of the ordered goods. The only incidence of this sales transaction that is nonlocal is the acceptance of the order." As in the present case, the contract between Scripto, Inc., and the "salesmen" specifically provided that the intention of the parties was to create the relationship of independent contractor. Id., 209. The *Scripto, Inc.* court found the nexus requiring Scripto, Inc., to pay a use tax to Florida to be the activities of the ten "salesmen," even though the "salesmen" were considered independent contractors. Id., 211. Whether the ten were salesmen or independent contractors, the *Scripto, Inc.* court concluded "that such a fine distinction is without constitutional significance. . . . To permit such formal 'contractual shifts' to make a constitutional difference would open the gates to a stampede of tax avoidance." Id.

The interaction between Dell Catalog Sales and Banc-Tec was based on service contract sales brokerage agreements. Under these agreements, Dell Catalog

Sales, as an affiliate of Dell USA, L.P., was authorized to offer for sale the BancTec service contracts to Dell Catalog Sales customers either at the time of the sale of the computer or at any time thereafter at an increase in price. As the parties have stipulated, Dell Catalog Sales acted as BancTec's broker in marketing BancTec's service contracts, and Dell entities provided certain technical assistance to BancTec in connection with BancTec's service contracts, in exchange for the contract commission. BancTec in turn agreed to enter into service contracts with those customers who purchased computers from Dell Catalog Sales.[3] In the sale of the service contracts on behalf of BancTec, Dell Catalog Sales set the price of the service contracts and retained as a commission, the difference between the retail price charged to the customer for each BancTec service contract sold by Dell Catalog Sales, and the amount due to BancTec for that contract. Dell Catalog Sales acknowledged that the sale of service contracts by BancTec to Connecticut customers was subject to the Connecticut sales tax. Dell Catalog Sales calculated and collected the Connecticut sales tax on the price of a service contract when a Dell Catalog Sales customer decided to purchase a Dell computer and a BancTec service contract. Dell Catalog Sales remitted the sales tax to the department of revenue services.

Although it appears that BancTec was operating in Connecticut on Dell's behalf, the parties have, in fact, stipulated that BancTec was an independent computer service provider throughout the United States and that on-site service was performed solely by BancTec or its subcontractors. This stipulation of the parties negates

[3] Although not raised by the parties, it does appear that the service contract sales brokerage agreements were, in general concept, an outsourcing agreement. "Outsourcing agreement" is defined as "[a]n agreement to handle substantially all of a party's business requirements, esp. in the areas of data processing and information management." Black's Law Dictionary (7th Ed. 1999).

the claim of the commissioner that BancTec was the agent of the plaintiff in Connecticut. By stipulating that BancTec was an independent service provider, the commissioner acknowledged that Dell had no right to direct and control the work of BancTec. See *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 132–33, 464 A.2d 6 (1983). The court also finds credible the testimony of Michael Burns, vice president of sales and marketing of BancTec, that servicing computers was BancTec's expertise and that Dell did not control or interfere in BancTec's dealings with the customer. This lack of control by Dell substantiates the stipulation of the parties that BancTec was not an agent for Dell.

In the actual operation of the service contract, the fulfillment of the contract required a significant effort by Dell Tech Support to correct the consumer's problem. For this effort, Dell received a major portion of the charge for the contract. BancTec, on the other hand, received a small portion of the charge for the contract, indicating that BancTec's effort in going on-site in Connecticut to service the consumer's computer had to be minimal. No evidence was presented as to the number of service calls, if any, that were made by BancTec's representatives on direction from Dell Tech Support. The court cannot assume that BancTec had a Connecticut representative in Connecticut or that the representative resided in another state and made service calls in Connecticut when directed.

The court notes that Dell provides service to the consumer under the terms of the service contract only by telephone in Texas, and BancTec, for its part, performs only on-site service to the consumer in Connecticut. The court notes further that Dell markets and sells the service contract to its own customer at the time that it sells the customer a computer; that Dell sets the price of the contract to the consumer; that Dell earns a substantial portion of the cost of the contract; and,

that Dell performs a substantial part of the service required under the terms of the service contract. Although Dell's name does not appear on the service contract as a contracting party, Dell is an integral part and a major ingredient in the performance of the contract. Cases concerning whether the use of independent service representatives provides the in-state physical contacts required to establish a nexus by an out-of-state seller focus on the extent of the activities of the in-state independent service representative. In *Scripto*, ten independent service representatives conducting continuous local solicitation in Florida and forwarding the orders to the out-of-state seller for acceptance of the orders was a sufficient nexus for the state of Florida to require the out-of-state seller to collect a state use tax on the sale of the goods shipped to customers in Florida. *Scripto, Inc.* v. *Carson*, supra, 362 U.S. 210–11. In *Tyler Pipe Industries, Inc.* v. *Dept. of Revenue*, supra, 483 U.S. 251, the United States Supreme Court held that having resident sales representatives in the taxing jurisdiction to establish and maintain the seller's market constituted physical contacts that established a sufficient nexus to impose a business and occupation tax on sales on the out-of-state seller. The *Tyler* court stated: "[T]he crucial factor governing nexus is whether the activities performed [in Washington] on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." (Internal quotation marks omitted.) Id., 250. *Tyler Pipe Industries, Inc.* was a direct tax case, not a sales and use tax case, but one sees that the principle of nexus associated with the extent of the in-state activity applies with equal force to cases involving sales and use taxes.

The Kansas Supreme Court, in deciding *In re Tax Appeal of Intercard, Inc.*, 270 Kan. 346, 14 P.3d 1111 (2000) (*Intercard*), did an extensive review of the following United States Supreme Court cases and state

supreme court cases concerning nexus: *Quill Corp.* v. *North Dakota,* supra, 504 U.S. 298; *Tyler Pipe Industries, Inc.* v. *Dept. of Revenue,* supra, 483 U.S. 232; *National Geographic Society* v. *California Board of Equalization,* 430 U.S. 551, 97 S. Ct. 1386, 51 L. Ed. 2d 631 (1977); *Complete Auto Transit, Inc.* v. *Brady, Inc.* 430 U.S. 274, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977); *National Bellas Hess, Inc.* v. *Dept. of Revenue,* supra, 386 U.S. 753; *Scripto, Inc.* v. *Carson,* supra, 362 U.S. 207; *Dept. of Revenue* v. *Care Computer Systems, Inc.,* 197 Ariz. 414, 4 P.3d 469 (Ariz. App. 2000); *Town Crier, Inc.* v. *Dept. of Revenue,* 315 Ill. App. 3d 286, 733 N.E.2d 780 (2000); *In re Tax Appeal of Scholastic Book Clubs, Inc.,* 260 Kan. 528, 920 P.2d 947 (1996); *Magnetek Controls, Inc.* v. *Revenue Division,* 221 Mich. App. 400, 562 N.W.2d 219 (1997); *Orvis Co.* v. *Tax Appeals Tribunal,* 86 N.Y.2d 165, 654 N.E.2d 954, 630 N.Y.S.2d 680, cert. denied sub nom. *Vermont Information Processing, Inc.* v. *Commissioner,* 516 U.S. 989, 116 S. Ct. 518, 133 L. Ed. 2d 426 (1995); *Koch Fuels, Inc.* v. *Clark,* 676 A.2d 330 (R.I.), cert. denied, 519 U.S. 930, 117 S. Ct. 301, 136 L. Ed. 2d 219 (1996).

The *Intercard* court, after analyzing the aforementioned cases, stated: "In summary, the Commerce Clause requires a taxing state to have substantial nexus with an out-of-state business to impose use tax collection and remittance duties. See *Complete Auto [Transit, Inc.* v. *Brady,* supra, 430 U.S.] 279. Substantial nexus requires a finding of physical presence in the taxing state. [*National Bellas Hess, Inc.* v. *Dept. of Revenue,* supra, 386 U.S.] 758. The continuous physical presence of offices and employees in a taxing state is sufficient to impose a use tax collection duty even though the in-state presence is unrelated to the transaction being taxed. *National Geographic [Society* v. *California Board of Equalization,* supra, 430 U.S.] 560. Mail-order sales without more are a 'safe harbor' for out-of-state vendors. [*National Bellas Hess, Inc.* v. *Dept. of Revenue Services,* supra, 386 U.S.] 758. A slightest presence is

not sufficient to establish a substantial nexus] [*National Geographic Society* v. *California Board of Equalization*, supra, 430 U.S. 556], but some states have found that 'more than a slightest presence' is sufficient. *Orvis* [*Co.* v. *Tax Appeals Tribunal*, supra, 86 N.Y.2d 178]. The physical presence requirement may turn on the presence in the taxing state of a small sales force, plant, or office. *Quill* [*Corp.* v. *North Dakota*, supra, 504 U.S. 315]." *In re Tax Appeal of Intercard, Inc.* supra, 270 Kan. 364.

In *Intercard*, Intercard's technicians made eleven visits to Kinko's stores in Kansas to install electronic data card readers purchased from Intercard. The eleven contacts occurred during a three month period and totaled forty-four hours. The court in *Intercard* noted that "[t]he parties stipulated that Intercard was not incorporated or registered as a foreign corporation doing business in Kansas; all contracts and sales occurred outside of Kansas; and Intercard had no offices or employees in Kansas." Id. The Kansas Supreme Court agreed with the findings of the Kansas board of tax appeals in *Intercard*, that the eleven "incursions to install card-readers in Kansas were isolated, sporadic, and insufficient to establish a substantial nexus to Kansas." Id.

The Kansas Supreme Court recently came to a contrary conclusion to that in *Intercard* and reversed the board of tax appeals' finding of no nexus in a commerce clause case. *In re Tax Appeal of Family of Eagles, Ltd.*, 275 Kan. 479, 66 P.3d 858 (2003) (*Family of Eagles*).

In *Family of Eagles*, two subsidiaries operated as selling branches for Family of Eagles, Ltd., a wholesaler. The wholesaler did not own property in Kansas and had no physical presence in Kansas except independent service representatives who were Kansas residents. The wholesaler purchased coins, jewelry, and other products at wholesale and resold these items through commissioned independent service representatives. There

was no solicitation in Kansas by the wholesaler through advertising, telemarketing or catalogs. The independent service representatives solicited retail purchase orders from Kansas residents on a one-on-one basis and sent purchase order forms with payment to the wholesaler in Texas for acceptance and shipping of the product to the customer by common carrier. An independent service representative could represent other companies and product lines and could sell to customers in any state.

The Kansas Supreme Court in *Family of Eagles* found that the facts in that case were similar to the salesmen in *Scripto* who took orders in Florida for a Georgia corporation. *In re Tax Appeal of Family of Eagles, Ltd.,* supra, 275 Kan. 490.

While *Intercard* was decided on the fact that eleven incursions into Kansas by Intercard technicians to install cardreaders were not sufficient to establish a substantial nexus under *Quill*, substantial nexus was found in *Family of Eagles*, even though "the record lacks clarity regarding the extent or amount of sales by Kansas [independent service representatives] to Kansas residents [and] no one has suggested that the Kansas [independent service representatives] never sell to Kansas residents. The [independent service representatives] do sell to Kansas residents and in doing so help to develop [the wholesaler's] Kansas market." Id., 488. The court in *Family of Eagles* did not explain how the wholesaler could develop a market in Kansas without knowing the extent or amount of sales it said was lacking from the record. It would seem that the Kansas court in *Family of Eagles* considered a sales force of independent service representatives in Kansas to be comparable to the sales force of independent service representatives in Florida under *Scripto* as the linchpin for finding nexus.

In the present case, Dell Catalog Sales, as the parties have stipulated, had no physical presence in Connecticut. From the standpoint of physical presence in Connecticut, between BancTec and Dell Catalog Sales customers, it was only the service contract that required BancTec to make an on-site service call to the customer in Connecticut. One cannot escape the fact, however, that BancTec served an important need of Dell Catalog Sales to service the Dell customers in Connecticut. Dell Catalog Sales benefited financially from the sales of the service contracts as well as the ability to have an outsourced repair service attend to the needs of its customers in Connecticut. See 2 R. Pomp & O. Oldman, supra, p. 9-63. The missing ingredient in determining whether BancTec's on-site service established nexus in Connecticut as a representative of Dell would be the frequency, if any, of the number of on-site service calls.

The present case is akin to the facts in *Intercard* in which the issue was whether the eleven service contacts during a three month period were sufficient to establish a substantial nexus. For the most part, the facts in the present case were developed by a stipulation of the parties. The stipulation of facts contains no information regarding the extent of BancTec's activities in Connecticut. One may infer, however, that because Dell earned 90 percent of the price of the service contract and BancTec earned 10 percent in Connecticut, the number of on-site calls must have been minimal.

Under *Quill* v. *North Dakota*, supra, 504 U.S. 317, the bright line test is substantial physical presence in the taxing state. A slight presence is not sufficient to establish a substantial nexus. *National Geographic Society* v. *California Board of Equalization*, supra, 430 U.S. 556. Isolated and sporadic physical contacts are insufficient to establish a substantial nexus to Connecticut. *In re Tax Appeal of Intercard, Inc.*, supra, 270 Kan. 364. This leads to the question of who has the burden to show the frequency of on-site service calls in Connecticut.

The commissioner initially determined that Dell Catalog Sales had sufficient physical contacts in Connecticut through the activities of BancTec to register Dell Catalog Sales in Connecticut involuntarily for the purpose of collecting a sales or use tax on the sale of computers to its Connecticut customers. Dell Catalog Sales has brought the present action challenging the commissioner's determination. The court is mindful of the general tax concept. " '[W]hen the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer.' " *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 295, 823 A.2d 1184 (2003), quoting *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 511, 767 A.2d 692 (2001). With this concept in mind, and recognizing that a tax appeal is a trial de novo; *Jones* v. *Crystal*, 242 Conn. 599, 601, 699 A.2d 961 (1997); the burden is placed on the commissioner to establish that Dell Catalog Sales had sufficient substantive physical contacts in this state to warrant the involuntary imposition of a tax. Because the court finds no facts to support the commissioner's claim that BancTec had a sufficient, substantive physical presence in the state of Connecticut, the plaintiff's appeal must be sustained.

Accordingly, judgment may enter in favor of the plaintiff sustaining this appeal without costs to either party.