922 So.2d 1257 (2006)
STATE of Louisiana and Secretary of the Department of Revenue and Taxation
v.
DELL INTERNATIONAL, INC., et al.
No. 2004 CA 1702.
Court of Appeal of Louisiana, First Circuit.
February 15, 2006.
Rehearing Denied March 30, 2006.
*1258 J. Michael Veron, Russell J. Stutes, Jr., P. Jody Lavergne, Joel M. Lutz, Lake Charles, John W. Perry, Jr., Daniel J. Balhoff, Baton Rouge, for Plaintiffs  Appellants State of Louisiana and Secretary of the Dept. of Revenue and Taxation.
H. Alston Johnson, III, Harry J. Philips, Jr., John Allain Viator, Baton Rouge, Maryann B. Gall, Todd S. Swatsler, Laura A. Kulwicki, Columbus, OH, Thomas R. Jackson, Dallas, TX, for Defendant  Appellee Dell Catalog Sales L.P.
Before: CARTER, C.J., WHIPPLE, GUIDRY, McCLENDON, and WELCH, JJ.
WELCH, J.
The State of Louisiana and Secretary of the Department of Revenue and Taxation (hereinafter collectively referred to as LDR) appeal a summary judgment rejecting their claim for unpaid use taxes against *1259 Dell Catalogue Sales, L.P. (Dell), an out-of-state vendor of computers and related products.[1] The sole issue presented for our review is whether Dell, through its contractual agreements with BancTec USA, Inc. (BancTec), has established the constitutionally mandated "substantial nexus" with the state of Louisiana to justify this state's imposition of use tax on Dell's sales to customers located in Louisiana.
Based on the evidence presented in support of and opposition to the Motion for Summary Judgment, the trial court concluded there were no genuine issues of material fact remaining and that LDR failed to prove that BancTec provided computer repair services in Louisiana to Dell customers on behalf of Dell and therefore Dell's activities in this state lacked the sufficient nexus to create the physical presence constitutionally required for the imposition of use tax.
After a thorough and de novo review of the record, we reverse the summary judgment granted in Dell's favor.

FACTUAL AND PROCEDURAL BACKGROUND
Dell is a national computer company that sells computers and related products nationwide via mail-order, the telephone and the internet. Its principal place of business is in Round Rock, Texas. Dell has no offices, stores, property, bank accounts, or direct employees in Louisiana. Dell solicits orders from outside the state of Louisiana through national media advertising, by sending mail-order catalogues and through the internet. Customer orders are accepted in Round Rock, Texas, and shipped from either Texas or Tennessee by common carrier or the United States Postal Service. The computers sold by Dell are manufactured by its affiliate, Dell Products, L.P. and other unaffiliated companies such as LogiTech and Iomega.
All Dell products come with a manufacturer's "return-to-factory" warranty provided by Dell. This warranty requires Dell's customers to return the defective product to locations outside of Louisiana for repair or replacement. At its inception, Dell recognized the customers' need for the convenience of on-site repair for hardware problems. In response, Dell pioneered the concept of "on-site" repair service, realizing it could gain an advantage over other sellers who required the customer to box up and return the computer to the store or a repair center.
Dell contracted with BancTec, Inc., a national company, to provide the on-site services for its products in Louisiana. In addition to its contracts with Dell, BancTec performs on-site computer repair services for other companies, such as Compaq and Toshiba. Dell and BancTec executed "Service Contract Sales Brokerage Agreements" detailing the terms and conditions of the service provided; the contracts pertinent to this suit, executed in 1991, 1995, and 1998, were offered in support of the summary judgment and are part of the record. In addition to this evidence, the record establishes that Dell invented and designed the on-site service program and was the first in the industry to offer it. Dell copyrighted the service and sold the contracts for service with BancTec to its interested customers at the time of sale of its products, or anytime thereafter that the customer desired. It collected and remitted sales tax on behalf of BancTec for the service contracts. Dell's advertising marketed, *1260 emphasized and warranted the service.
The contracts provided that a customer must contact Dell directly. Dell then independently determines whether to dispatch BancTec technicians, who, although not direct employees of Dell, have been trained by Dell and are directed by Dell on what services to provide a particular customer and on how the service will be performed. Dell sets the price for the service and compensates BancTec based on the number of on-site service calls or "dispatches" BancTec makes at Dell's direction. Dell provides all parts and makes all decisions concerning the services provided by BancTec to Dell's customers. Finally, although the service contracts were between the customer and BancTec, Dell reserved the right to terminate the contracts and hire another third party to perform them if BancTec failed to meet Dell's performance standards. The record establishes that Dell through BancTec is clearly in control of the on-site computer repairs.
On December 30, 1998, LDR filed suit against Dell seeking payment of unpaid use, income and franchise taxes for the years 1995, 1996, 1997, and 1998, plus penalties and interest. A series of exceptions disposed of all claims other than the use tax. As a basis for that claim, LDR alleged that Dell had established a physical presence in Louisiana by providing repairs and services on products sold to Louisiana customers through the use of "agents, employees and/or independent contractors" in Louisiana. Dell answered the suit denying that it had a physical presence in Louisiana and asserting it has no employees, sales agents or representatives in Louisiana and that it does not, either directly or indirectly, provide on-site services or repairs on its computer products in Louisiana. With regard to BancTec and the repair services it provides in Louisiana, Dell claimed that BancTec was not its agent, but rather an independent company that performed computer repairs nationwide pursuant to contracts between itself (BancTec) and the customers, and was not acting "on behalf of" Dell.
On March 18, 2004, Dell filed a Motion for Summary Judgment and submitted the following evidence in support thereof: (A) the affidavit of Shelley Matcha, Dell's director of state and local tax, and three attachments thereto consisting of the Service Contract Sales Brokerage Agreements executed between Dell and BancTec in 1991, 1995, and 1998; (B) the case of Dell Catalog Sales, L.P. v. Commissioner of Revenue Services, 48 Conn.Supp. 170, 834 A.2d 812 (2003) (a case dealing with the exact same issue between Dell and BancTec's activities in the state of Connecticut, in which the Superior Court of Connecticut held that the record contained insufficient evidence to prove that BancTec's activities in Connecticut were performed on behalf of Dell. We note, however, that the decision expressly notes that the court's finding was based primarily on the lack of evidence in the record to establish the focus and extent of the activities of BancTec's independent service representatives in Connecticut, particularly evidence regarding the frequency or number of the on-site services actually performed in Connecticut.); (C) excerpts of the deposition testimony of Dell executives, Michael Burns, Emily Parrino, Harvey Sanders, and Brian Stone.

SUMMARY JUDGMENT LAW
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Craig v. Bantek West, Inc., XXXX-XXXX (La.App. 1st Cir.9/17/04), 885 So.2d 1241, 1244; Western Sizzlin Steakhouse v. McDuffie, XXXX-XXXX (La.App. 1st *1261 Cir.3/28/03), 844 So.2d 355, 357, writ denied, XXXX-XXXX (La.6/20/03), 847 So.2d 1236. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). On a motion for summary judgment, the burden of proof is on the mover. When the issue before the court on the motion for summary judgment is one on which the party bringing the motion will bear the burden of proof at trial, the burden of showing that there is no genuine issue of material fact is on the party bringing the motion. La. C.C.P. art. 966(C)(2); Buck's Run Enterprises, Inc., v. Mapp Constr., Inc., 99-3054 (La. App 1st Cir. 2/16/01), 808 So.2d 428, 431. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require that all essential elements of the adverse party's claim, action, or defense be negated. Instead, the mover need only point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La. C.C.P. art. 966(C)(2); Robles v. ExxonMobile, XXXX-XXXX (La.App. 1st Cir.3/28/03), 844 So.2d 339, 341.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226, 230; Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Authority, XXXX-XXXX (La.4/9/03), 842 So.2d 373, 377. An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Ernest v. Petroleum Service Corp., 2002-2482 (La.App. 1st Cir.11/19/03), 868 So.2d 96, 97, writ denied, XXXX-XXXX (La.2/20/04), 866 So.2d 830. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Foreman v. Danos and Curole Marine Contractors, Inc., 97-2038 (La.App. 1st Cir., 9/25/98), 722 So.2d 1, 4, writ denied, 98-2703 (La.12/18/98), 734 So.2d 637.

APPLICABLE LOUISIANA TAX LAW
Generally, Louisiana imposes a sales tax on the retail sale in this state of each item of tangible personal property. La. R.S. 47:302. In addition to a sales tax, Louisiana imposes a use tax on items purchased in other states, but brought into Louisiana for use, consumption, distribution, and storage for use and consumption. La. R.S. 47:302. A use tax ordinarily serves to complement the sales tax of a state by eliminating the incentive to make major purchases in states with lower sales taxes. State v. Quantex Microsystems, Inc., XXXX-XXXX (La.App. 1st Cir.7/3/01), 809 So.2d 246, 250 (citing J. Ray McDermott, Inc. v. Morrison, 96-2337 (La.App. *1262 1st Cir.11/7/97), 705 So.2d 195, 203, writs denied, 97-3055, 97-3062 (La.2/13/98), 709 So.2d 753, 754). Louisiana law provides that any dealer who neglects, fails or refuses to collect the applicable tax from the purchaser shall be liable for and pay the tax himself. La. R.S. 47:304(C).
Article I, § 8, cl. 3, of the United States Constitution, known as the Commerce Clause, authorizes Congress to regulate commerce among the several states. Despite this express grant of power to Congress, the United States Supreme Court has consistently held that this language contains a further negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject. Oklahoma Tax Commission v. Jefferson Lines, Inc., 514 U.S. 175, 179, 115 S.Ct. 1331, 1335, 131 L.Ed.2d 261 (1995). The validity of a state tax is assessed using a four-part test set forth by the U.S. Supreme Court in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under that test, a state tax will be upheld in the face of a Commerce Clause challenge so long as the tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State. Id. at 279, 97 S.Ct. 1076.
A vendor whose only contacts with the taxing state are by mail or common carrier lacks the substantial nexus required by the Commerce Clause. Quill Corporation v. North Dakota, 504 U.S. 298, 311, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992) (citing National Bellas Hess, Inc. v. Department of Revenue of Ill., 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967)). However, if such a vendor maintains a "physical presence" in the taxing state, the "substantial nexus" requirement is fulfilled.
In Scripto Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), the Supreme Court of the United States approved the imposition of a use tax by the state of Florida against a Georgia corporation that sold and shipped writing instruments to Florida residents from its principal place of business in Atlanta. Scripto had no office or regular employees in the state of Florida. Although orders for Scripto's products were solicited in Florida by "advertising specialty brokers," or wholesalers, who were residents of Florida, Scripto opposed the imposition of the use tax and denied it had the requisite "physical nexus" in Florida because its contract with its brokers specifically provided they were "independent contractors." The Supreme Court rejected Scripto's argument, finding the wholesalers' contractual designation as independent contractor "neither results in changing his local function of solicitation nor bears upon its effectiveness in securing a substantial flow of goods into Florida." Id. at 211, 80 S.Ct. 619. The Court concluded that such contractual shifts in tagging agents as "independent" was a "fine distinction ... without constitutional significance," and reiterated that the appropriate test is simply the nature and extent of the activities of the party being taxed. Id. at 211, 80 S.Ct. 619.
The Supreme Court expounded on this test when it revisited the issue in Tyler Pipe Industries, Inc. v. Washington State Department of Revenue, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), where again, the activities of in-state sales "representatives" provided the sufficient physical nexus to warrant imposition of that state's use tax against an out-of-state seller, notwithstanding that the sales "representatives" were deemed independent contractors. *1263 Finding the representatives were properly characterized as "agents" based on their activities in the taxing state, the Court stated, "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state." Id. at p. 250, 107 S.Ct. 2810.
This court has already had the opportunity to adopt and apply the foregoing test in a similar set of circumstances. In State v. Quantex Microsystems, Inc., XXXX-XXXX (La.App. 1st Cir.7/3/01), 809 So.2d 246, we held that an out-of-state corporation's use of independent contractors to provide on-site computer repair services in Louisiana may constitute the substantial nexus necessary for the imposition of use tax if "the activities ... of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in the taxing state." Id. at p. 252 (emphasis added)(citing Tyler Pipe Industries, Inc., 483 U.S. at 250, 107 S.Ct. 2810). Quantex involved a New York corporation, with its principal place of business in New Jersey, selling computer products to Louisiana residents via the mail, telephone and the internet. Like Dell, Quantex had no offices, bank accounts, direct employees or other property in the state of Louisiana. As part of the limited warranty provided to its customers, Quantex represented that it could provide on-site services for the replacement of hardware parts for up to one year after the date of purchase. LDR filed suit against Quantex for use tax, claiming it had established the sufficient physical nexus with this state by providing repair services for its products in Louisiana through the use of third-party agents. Quantex sought summary judgment on the basis that the third parties that provided repair services on its products in Louisiana were "independent contractors," which cannot constitute the substantial nexus to support state taxation. Summary judgment was granted, but this court reversed, finding the trial court erred as a matter of law in ending the inquiry with the "independent contractor" designation. We reiterated again that the crucial factor governing nexus is whether the activities performed in the taxing state are significantly associated with the taxpayer's ability to establish and maintain a market in the taxing state. Quantex, 809 So.2d at 251-252. In Quantex, we found the record revealed disputed issues of fact regarding who, in fact, performed the in-state services and a complete lack of evidence regarding the extent of those services, and "whether that activity was significantly associated with Quantex's ability to establish and maintain a market in Louisiana." Quantex, 809 So.2d at 252. Thus, summary judgment was reversed and the matter was remanded.[2]
Unlike in Quantex, this record contains both documentary evidence and deposition testimony detailing the contractual relationship between Dell and BancTec as well as the nature and extent of the services provided by BancTec and most significantly, evidence regarding the significance of BancTec's services on Dell's "ability to establish and maintain a market in Louisiana."
The trial court found that no agency relationship existed between Dell and BancTec and that BancTec was an independent company performing repair services *1264 for Dell as well as other companies. The trial court concluded that BancTec provided computer repair services "on behalf of the paying customers who bought the contract[s]," rather than on behalf of Dell; and therefore, Dell's activities in Louisiana lack the sufficient nexus to create a physical presence required for the imposition of use tax and granted summary judgment in its favor.
Our de novo review of this matter reveals that the trial court erred as a matter of law in concluding based on those facts no issue of material fact existed that Banc-Tec was not acting on behalf of Dell. On appeal, Dell maintains the trial court was correct in finding BancTec was not its contractual "agent," rather it was a "broker" and therefore, was not acting "on its behalf." Dell argues semantics, rather than law, and as noted by the Court in Scripto, these are fine distinctions without constitutional significance. Moreover, the trial court and Dell both ignore the Supreme Court's admonition in Scripto, that the "contractual tagging" of a third party as an independent contractor or salesman is simply insufficient to change the function of the third party "nor bears on its effectiveness in securing a substantial flow of goods into [the state]." 362 U.S. at 211, 80 S.Ct. 619. The nature and extent of the activities (Scripto, 362 U.S. at 211, 80 S.Ct. 619) and whether those activities are significantly associated with the taxpayer's ability to establish and maintain a market in this state (Tyler Pipe Industries, Inc., 483 U.S. at p. 250, 107 S.Ct. 2810; Quantex, 809 So.2d at 252) are the determinative factors of whether Dell's contractual dealings with BancTec constitute a sufficient physical nexus for the purpose of justifying the imposition of a use tax. Following is a detailed account of the evidence presented regarding these factors.

A. The Extent and Nature of the Activities
Dell's argument that it had no obligation to the customers with on-site service contracts and that BancTec was providing services based on its own contractual obligations with its customers belies the many other facts establishing Dell's participation and direction in drawing up the contracts. The contracts themselves detail the services reflecting that Dell retained control over many of the significant aspects of the services to be provided by BancTec: Dell receives and screens all calls for service  every customer who purchased an on-site service contract with BancTec through Dell is required to contact Dell directly whenever service is needed; the customers do not contact BancTec. Dell diagnoses the problem by telephone and independently determines whether a BancTec technician is dispatched. Upon dispatch, Dell closely monitors BancTec's performance: BancTec has to report directly to Dell regarding its findings if they were different from Dell's diagnosis and then is required to use only Dell products for the approved repairs. BancTec certified technicians are trained and directed by Dell on how to perform the service calls and repairs, including using "scripts" detailing how they should communicate with the customers. Dell sets the price for the on-site services and compensates BancTec based on the number of service calls made. The contracts also required BancTec to warrant its services to Dell (not to the customer) and to "positively represent" Dell while performing the on-site services. Dell requires BancTec to post a surety bond to guarantee its customers will receive satisfactory service. Dell's corporate representative, Harvey Sanders, testified that Dell designed and created the services that would be provided prior to executing the contracts with BancTec. Mr. Sanders *1265 also confirmed that Dell copyrighted the contracts between it and BancTec.
The record also established that Dell uses the on-site service availability as part of its advertising and guarantees those services to its customers. The evidence also reveals that from July 1998 through July 2003, BancTec was dispatched by Dell and performed more than 30,000 service calls for customers in Louisiana. Dell hired a separate agency to monitor customer satisfaction with BancTec's repair services and expressly reserved the right to terminate its agreement with BancTec at any time that BancTec's performance did not meet Dell's expectations and/or approval.
The foregoing facts are essentially undisputed and could ultimately be legally determinative of satisfying the substantial nexus test. The argument presented by Dell  that it was not obligated to perform the repair services and that the foregoing facts fail to establish that BancTec was acting "on its behalf," although couched in terms of a factual dispute, could be construed to be an exercise in semantics to "contractually tag" the third party as independents or non-agents with the ultimate aim at having a presence in this state yet avoid taxation. The Supreme Court of the United States in Scripto and Tyler Pipe have expressly admonished against such tagging, deeming it to be a distinction without constitutional significance and which is clearly prohibited by law.

B. The Association Between Those Activities and Dell's Ability to Establish and Maintain a Market in Louisiana
The record also clearly establishes that having BancTec contracted to provide on-site repair services on Dell's computers in this state was highly critical to Dell's ability to establish and successfully maintain a market in this state. As revealed by the evidence, Dell foresaw that it would be difficult, if not impossible, to compete with local computer dealers without providing some kind of warranty service. The record contains the following excerpt from the chairman and CEO of Dell, Michael Dell's book entitled Direct from Dell: Strategies that Revolutionized an Industry:
Pretty early on in the company's life, we concluded that we wanted to earn a reputation for providing great customer service, as well as great products.... What was really important was sustaining loyalty among customers and employees, and that could only be derived from having the highest level of service and very high-performing products.
. . . .
From the very beginning, we saw a huge opportunity to provide extraordinary service where our competitors saw none  and designated it as one of the company's early objectives. In 1986, we offered the very first program in our industry for on-site service a a kind of "house call" service for sick computers. If your computer had a problem, you didn't have to go anywhere; we came to you  to your business, house, or hotel room.... What the competition initially assumed would be a disadvantage for us turned out to be a massive advantage.

(Emphasis added).
Dell's corporate representative, Harvey Sanders, confirmed that providing on-site service was one of Dell's primary objectives and that it was a very significant factor in Dell's ability to establish and maintain a market in other states and led to its subsequent success. Given the importance of this element of Dell's offerings to its customers to the ultimate success of the company, it was understandably prudent for Dell to design and retain ultimate control over its service providers, as the *1266 record clearly reveals it did. The trier of fact could clearly find for the purpose of taxation that Dell hid behind the fact that it hired a third party to provide this service in state or tag that third party as "independent" to destroy nexus with this state which is contrary to law and to the mandates and admonitions of the Supreme Court of the United States.

CONCLUSION
Both the extent and the nature of the services provided by BancTec to Dell's Louisiana customers as well as the impact of this service on Dell's ability to establish and maintain a lucrative market in this state are clearly presented as evidence in this record. Applying the well-settled law to the facts of this case, we can not conclude that Dell established an absence of factual support for the claim by LDL that BancTec provided computer repair services in Louisiana to Dell customers on behalf of Dell and thus, that Dell's activities in this state constituted a sufficient nexus to create the physical presence constitutionally required for the imposition of a use tax herein. Thus, Dell failed to establish its entitlement to judgment in its favor as a matter of law. We remand this matter to the trial court for further proceedings consistent herewith. The summary judgment granted in favor of Dell is hereby reversed.
REVERSED AND REMANDED.
GUIDRY, J., concurs.
McCLENDON, J., dissents and assigns reasons.
McCLENDON, J., dissents.
As noted by the majority opinion, Dell sells computers in Louisiana only through catalog mail orders. The issue here is whether Dell had a physical presence in Louisiana sufficient to support Louisiana's imposition of a use tax on Dell's sales without violating the Commerce Clause of the United States Constitution.
Generally, "a vendor whose only contacts with the taxing state are by mail or common carrier lacks the `substantial nexus' required by the Commerce Clause." Quill Corporation v. North Dakota, 504 U.S. 298, 311, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992). "[T]he `substantial nexus' requirement is not, like due process' `minimum contacts' requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce." Quill, 504 U.S. at 313, 112 S.Ct. at 1913. Thus, [an out-of-state vendor] may have the minimum contacts necessary to establish personal jurisdiction, but not meet the "substantial nexus" required for taxation. Id.
In National Bellas Hess, Inc. v. Department of Revenue of Illinois, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), the United States Supreme Court provided a bright line physical presence test to determine if the requisite "substantial nexus" exists. However, more than a vendor's "`slightest presence is required.'" Quill. 504 U.S. at 315 n. 8, 112 S.Ct. at 1914 n. 8 citing National Geographic Society v. California Board of Equalization, 430 U.S. 551, 556, 97 S.Ct. 1386, 1390, 51 L.Ed.2d 631 (1977). The physical presence test may also be met through the activities of a third party acting on behalf of the vendor, including some independent contractors. See Tyler Pipe Industries, Inc. v. Washington State Department of Revenue, 483 U.S. 232, 250, 107 S.Ct. 2810, 2821, 97 L.Ed.2d 199 (1987); Scripto, Inc. v. Carson, 362 U.S. 207, 211, 80 S.Ct. 619, 621, 4 L.Ed.2d 660 (1960); State v. Quantex Microsystems, Inc., XXXX-XXXX, p. 8 (La.App. 1 Cir. 7/3/01), 809 So.2d 246, 251. Further, in analyzing the activities of third parties, the "`crucial factor governing nexus is *1267 whether the activities performed in [the taxing] state on behalf of the [vendor] are significantly associated with the [vendor's] ability to establish and maintain a market... for the sales."' Tyler Pipe, 483 U.S. at 250, 107 S.Ct. at 2821, quoting with approval from one of the cases on review, Tyler Pipe Industries, Inc. v. State, Department of Revenue, 105 Wash.2d 318, 323, 715 P.2d 123, 126 (1986).
The material facts in this case are undisputed. BancTec does not solicit sales for Dell. Under BancTec's contract with Dell, BancTec provided repair services for Dell computers, but only to those buyers who purchased an optional service agreement with BancTec. Although Dell maintains a customer relationship with its customers, and offers phone consultations, the contracting parties to the service agreement for onsite repairs are the buyer and BancTec. BancTec provides similar services to other companies, including Compaq, Toshiba, and Verizon.
In my mind, Dell's notice to its customers that an optional service agreement with BancTec may be purchased, Dell's collection and transmittal of BancTec's fee for the agreement, Dell's attempts to insure quality control, and its insistence that BancTec not disparage Dell during the repair process, do not rise to the level of activities sufficient to find that BancTec was acting on behalf of Dell. Further, even assuming BancTec was acting on behalf of Dell such that physical nexus was established, I do not find that an un-sworn statement in a mass marketed book is sufficient to prove that the activities allegedly performed on behalf of Dell were significantly associated with Dell's ability to establish or maintain a market for the sale of its computers. Therefore, the requirement of a substantial nexus has not been met. Thus, I respectfully dissent from the reversal of the summary judgment in favor of Dell. On the facts before us, Dell was entitled to summary judgment as a matter of law.
NOTES
[1] The original petition named as defendants Dell International, Inc., Dell Catalog and Sales Corporation, Dell Financial Services, L.P. and Dell Catalog Sales, L.P. Three of these four named entities were dismissed from the suit as a result of various exceptions, leaving Dell Catalog Sales, L.P., hereinafter referred to as "Dell," as the sole defendant.
[2] One judge dissented, being of the opinion that a company must first have a physical nexus in the form of a physical location or employees in the state before any further inquiry is made regarding the significance of that presence to the taxpayer's ability to maintain a market in the state.