Certiorari Denied, No. 31,181, July 18, 2008

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMCA-001

Filing Date: June 3, 2008

Docket No.  26,843

 DELL CATALOG SALES L.P.,

    Protestant-Appellant,

v.

TAXATION AND REVENUE
DEPARTMENT OF THE
STATE OF NEW MEXICO,

    Respondent-Appellee.


APPEAL FROM THE TAXATION AND REVENUE DEPARTMENT OF THE STATE OF NEW MEXICO
**Margaret B. Alcock, Hearing Officer**

Freedman Boyd Daniels Hollander
Goldberg & Ives, P.A.
John W. Boyd
Albuquerque, NM

Jones Day
Maryann B. Gall
Todd S. Swatsler
Laura A. Kulwicki
Columbus, OH

for Appellant
Gary K. King, Attorney General
Peter Breen, Special Assistant Attorney General
Julia Belles, Special Assistant Attorney General
Santa Fe, NM

**OPINION**

**FRY, Judge.**

**{1}** Dell Catalog Sales L.P. (Taxpayer) appeals from a decision and order of a hearing officer of the New Mexico Taxation and Revenue Department (the Department). Pursuant to the Gross Receipts and Compensating Tax Act (the Act), NMSA 1978, §§ 7-9-1 to -111 (1966, as amended through 2007), the Department assessed gross receipts taxes on Taxpayer's mail-order computer sales and compensating taxes on Taxpayer's use of distributed catalogs. Taxpayer disputes that its activities are subject to gross receipts and compensating taxes, arguing that imposition of the taxes (1) is wrong under the language of the Act itself and (2) violates the Commerce Clause of the United States Constitution. We affirm the hearing officer's assessments of both gross receipts tax and compensating tax.

**BACKGROUND**

**{2}** Taxpayer is a Texas limited partnership with its principal place of business in Round Rock, Texas. Taxpayer does not own or lease property in New Mexico, has no retail stores within the state, and has no sales agents or employees here. Taxpayer does not franchise or license its trade name in New Mexico.

**{3}** Taxpayer, an entity created to sell computers to individual customers, is a partnership owned entirely by Dell, Inc. (known as Dell Computer Corporation at the time of the audit). Dell, Inc. owned several other limited partnerships, including Dell USA, L.P., which "performed general and administrative services for the other limited partnerships," Dell Products, L.P., which researched, developed, and manufactured computer products for the other limited partnerships, and Dell Marketing, L.P. and Dell Direct Sales, L.P., which sold computers to businesses and institutions. The limited partnerships were separately controlled by their own individual "executives, officers and employees who were responsible for the policy-making and day-to-day operations." The separate entities did not distinguish themselves by their separate names in contracts and advertising materials with outside parties, referring to themselves collectively and individually as "Dell."

**{4}** Taxpayer, using a "direct-to-the-customer sales model," sold computers to individual customers, which entailed Taxpayer's purchasing computers and related goods from Dell Products L.P. and re-selling them to individual consumers by way of mail-order catalogs and internet sales. At all relevant times, individual customers contacted Taxpayer in Round Rock, Texas, directly by telephone, mail, or over the internet and placed orders by email, telephone, mail, or facsimile. Taxpayer shipped the computers and merchandise to customers in New Mexico on a common carrier selected by Taxpayer; customers did not have the option to pick up their merchandise directly. The contracts between Taxpayer and its customers specified that the title to the merchandise transferred from Taxpayer to the

customer *upon shipment* from the facility outside of New Mexico, but Taxpayer retained the risk of loss on merchandise until delivery to the customer.

**{5}** Under the name Dell Home Systems, Taxpayer also advertised by mailing catalogs to potential customers in New Mexico. The catalogs were not designed, printed, prepared, or stored in New Mexico, and they were mailed from out of state into New Mexico. Taxpayer also advertised in national specialty magazines but never entered New Mexico to purchase or display advertising materials.

**{6}** Taxpayer's merchandise was covered by a manufacturer's limited warranty covering parts and labor in the first year and parts only in the second and third years. The warranty did not provide for "on-site repair services"; rather, it required that a customer ship the defective part(s) back to Taxpayer in Texas for repair or replacement. If the customer was willing to replace a defective part, then Taxpayer would mail the replacement part to the customer and include a prepaid return shipping label for the customer to return the defective part.

**{7}** For those customers who wanted on-site repair service, Taxpayer contracted with a third-party service provider, BancTec U.S.A., Inc. (BancTec), to repair Dell computers at the customers' homes under service contracts that Taxpayer sold to customers. BancTec is a Delaware corporation with its principal place of business in Dallas, Texas. Taxpayer has no ownership interest in BancTec, and BancTec owns no part of Taxpayer's limited partnership or any other Dell enterprise.

**{8}** Essentially, Taxpayer sold service contracts to its customers who bought computers, and Taxpayer negotiated with BancTec for BancTec to provide the in-home service repairs on the computers. Purchasers of computers had the option of purchasing a service contract at the time they purchased the computer or at any subsequent time. For example, when a customer ordered a computer over the phone, Taxpayer's representative would ask the customer if he wished to purchase a service contract. Taxpayer often "bundled" the cost of the service contract with other items in the sales package as a marketing tool.

**{9}** Following a purchase, when a customer in New Mexico contacted Taxpayer regarding a problem with a Dell computer, Dell Customer Technical Support (Technical Support) would first troubleshoot and attempt to resolve the problem over the phone. Only if Technical Support was unable to diagnose and correct the problem over the phone would Technical Support then contact BancTec to dispatch a technician to the customer's house to service the computer. Customers did not contact BancTec directly, but had to go through Taxpayer, and BancTec's name did not appear in Taxpayer's advertising materials. BancTec was required to accept all contracts sold by Taxpayer, and BancTec was the only service provider with which Taxpayer contracted to provide service at the time of the audit. The hearing officer found that "[t]he availability of in-home service was an important factor in establishing [Taxpayer's] market for sales." Approximately seventy-five percent of Taxpayer's customers in New Mexico purchased the additional service contract.

**{10}** Once BancTec was dispatched to the customer, its activities were specifically defined in the agreement between Taxpayer and BancTec. For example, BancTec had to contact the customer within thirty minutes of the notice of dispatch, track every service call, and train its technicians to meet a certain skill level. BancTec's employees had to "conduct themselves in a manner that would professionally and positively represent the parent company as well as Dell Computer Corporation and other partners."

**{11}** After BancTec technicians diagnosed the problem on a service call, Technical Support would ship any parts necessary for a repair to a warehouse in Austin, Texas, owned by Taxpayer and subleased by BancTec. BancTec was required to use replacement parts issued by Technical Support, and BancTec, prohibited from using the parts provided by Taxpayer for any purpose other than servicing a customer's computer, was essentially a bailee of the replacement parts issued by Technical Support. If BancTec could not resolve the problem or had further complications on a call, the BancTec technician was required to call Technical Support for additional assistance.

**{12}** If the customer was unsatisfied with the BancTec technician, the customer did not report the complaint directly to BancTec but instead registered the complaint with Technical Support, which in turn reported the problem to BancTec management. BancTec's work was warranted to Taxpayer, not to the individual customers themselves. The agreement between Taxpayer and BancTec provided that, in the event BancTec's "service level performance" was below a certain level for a set period of time, Taxpayer could take over BancTec's obligations or assign the obligations to another third party.

**{13}** BancTec was paid based on a formula that considered, among other factors, the number of on-site service repairs made during the previous ninety-day period and the level of BancTec's performance. The arrangement was profitable to both BancTec and Taxpayer. Dell, Inc. acted as agent for BancTec, registered BancTec in New Mexico, and paid all New Mexico gross receipts tax on Taxpayer's sale of BancTec's service agreements to New Mexico customers.

**{14}** In July 1999, the Department audited Taxpayer and determined that Taxpayer had not reported or paid either gross receipts taxes owed on its sales of computers to New Mexico customers or compensating taxes owed on the value of advertising materials Taxpayer distributed in New Mexico. The Department assessed a total of $1,817,693.43 for the period from January 1993 to June 1999, which included $1,140,735.71 for gross receipts tax and $31,908.69 for compensating tax. Taxpayer filed a written protest to the assessment.

**{15}** After a formal hearing before a hearing officer, the hearing officer submitted a sixty-page decision and order, incorporating many findings of fact based on the stipulated facts and the testimony at the hearing. The hearing officer concluded that: (1) Taxpayer was selling property in New Mexico and was liable for gross receipts tax on the sales, (2) imposition of the gross receipts tax did not violate the Commerce Clause of the United States Constitution, and (3) Taxpayer was liable for compensating tax on the catalogs it mailed to

4

New Mexico addresses.

**{16}** Taxpayer appealed, asserting that its computer sales do not constitute "sales" within the meaning of the Act or, alternatively, if they are sales, that the imposition of gross receipts tax on the sales violates the Commerce Clause of the United States Constitution. Taxpayer makes the same statutory and constitutional arguments regarding the hearing officer's determination that the compensating tax applied to advertising materials used by Taxpayer. We address the arguments in turn.

## DISCUSSION

### Standard of Review

**{17}** Taxpayer raises statutory and constitutional issues on appeal, both of which are questions of law that we review de novo. *Sonic Indus. v. State*, 2006-NMSC-038, ¶ 7, 140 N.M. 212, 141 P.3d 1266 (applying de novo review of application of law to the facts and to questions of statutory interpretation); *Manning v. N.M. Energy, Minerals & Natural Res. Dep't*, 2006-NMSC-027, ¶ 9, 140 N.M. 528, 144 P.3d 87 (reviewing constitutional question under de novo standard). We presume the tax assessments of the Department to be correct, NMSA 1978, § 7-1-17(C) (1992) (amended 2007), and we recognize that there is a statutory presumption that the gross receipts tax applies to any person engaging in business in New Mexico. § 7-9-5.

### I.     The Assessment of Gross Receipts Tax on Taxpayer's Sales of Computers in New Mexico Was Proper

**{18}** Our Supreme Court set out a two-part analytical process to determine whether the gross receipts tax applies in multi-state transactions.

> First we must engage in statutory interpretation to determine if the Legislature intended to tax those receipts under the [gross receipts tax]. Second, if we conclude [in the affirmative], we must determine whether the tax violates the Commerce Clause . . . of the United States Constitution.

*Kmart Corp. v. Taxation & Revenue Dep't*, 2006-NMSC-006, ¶ 11, 139 N.M. 172, 131 P.3d 22. We apply this framework to the present case.

### A.     Taxpayer's Activities Constitute Sales of Property in New Mexico for Purposes of the Act

**{19}** Our first inquiry is whether Taxpayer's activities constitute sales under the Act. To answer this question we use principles of statutory construction to guide us in our interpretation of the state tax code. "Our main goal in statutory construction is to give effect to the intent of the legislature." *Hall v. Carlsbad Supermarket/IGA*, 2008-NMCA-026, ¶ 7,

5

143 N.M. 479, 177 P.3d 530 (internal quotation marks and citation omitted). We discern legislative intent by first looking at the plain meaning of the language of the statute, reading "the provisions of [a statute] together to produce a harmonious whole." *Id.* (internal quotation marks and citation omitted).

**{20}** Section 7-9-3.5(A)(1) defines "gross receipts" as "the total amount of money or the value of other consideration received from *selling property in New Mexico.*" (Emphasis added.) In determining the meaning of the emphasized language, we first discuss our Supreme Court's recent cases addressing gross receipts tax, *Kmart* and *Sonic*.

**{21}** In *Kmart*, the Supreme Court addressed the issue of whether the gross receipts tax applied to the receipts from the granting of a license to use intellectual property, such as trademarks and trade names, when the licensing agreement activities all took place in Michigan. 2006-NMSC-006, ¶ 4. The parties to the licensing agreement in *Kmart* were Kmart, a retailer of goods that operated stores in New Mexico, and KPI, a wholly owned Michigan subsidiary of Kmart and "investment holding company" created to reduce Kmart's tax liabilities. *Id.* ¶¶ 3-5 (internal quotation marks omitted). After discussion of the purpose and history of the Act, our Supreme Court said that "the issue in this case may be resolved completely by examining the language of the . . . Act." *Id.* ¶¶ 12-15, 18. The Court said that "licensed property can only be subject to the [gross receipts tax] in New Mexico if the license was in essence *sold in New Mexico*," and the Act applies "when the selling of property takes place within the borders of New Mexico." *Id.* ¶ 18. The Court held that the intangible property rights at issue in *Kmart* were not sold in New Mexico because "all activity related to the License Agreement took place in Michigan." *Id.* Specifically, the Court noted that the "critical elements and parties" were in Michigan, and it rejected any argument that the gross receipts tax is intended to apply to property merely *used* in New Mexico. *Id.*

**{22}** The Supreme Court also addressed intangible property rights in *Sonic*. That case involved the question of whether franchise rights sold out of state for use in New Mexico were taxable under the Act. 2006-NMSC-038, ¶ 14. Franchise owners traveled from New Mexico to Oklahoma to sign the agreements that gave them rights to use Sonic trademarks and other intellectual property, and the franchisees paid royalties based on the revenues of the Sonic franchises. *Id.* ¶ 2. The Court held that the sales of these intangibles were not taxable because the services provided by the corporation were "in large part performed outside New Mexico." *Id.* ¶¶ 1-2, 14.

**{23}** Relying on *Kmart* and *Sonic*, Taxpayer argues that its activities selling computers by mail, phone, and internet orders from its facility in Texas to New Mexico customers do not constitute "selling property in New Mexico" for purposes of the Act because it contends that the sales occurred in Texas, not New Mexico. Taxpayer's principal argument to support that contention is that a sale occurs where title transfers, not where the property is ultimately used or located.

6

**{24}** The hearing officer disagreed with Taxpayer and concluded that the transactions at issue were "consummated" in New Mexico when Taxpayer completed delivery of the computers to New Mexico customers because "one of the two parties and many of the critical elements involved in [Taxpayer's] sales of tangible goods were located in New Mexico." The hearing officer, concluding that the sales occurred in New Mexico, also based her decision on the facts that Taxpayer retained the risk of loss until delivery and that transfer of physical possession occurred within New Mexico.

**{25}** We agree with the hearing officer that the facts in *Sonic* and *Kmart* are distinguishable from the case at bar. *Kmart* and *Sonic* apply in cases where the entire transaction occurs out of state and the parties are present out of state at the time and place of the transaction. In those circumstances, the transaction is clearly not a sale "in New Mexico" for purposes of the Act. *See Sonic*, 2006-NMSC-038, ¶ 2 (stating that "the franchisees travel[ed] to Oklahoma City to sign the [licensing agreements]"); *Kmart*, 2006-NMSC-006, ¶ 4 (stating that "[a]ll activity related to the License Agreement took place in Michigan"). In this case, however, a New Mexico customer picked up the phone, mailed an order form, or placed an order over the internet *from* New Mexico to Taxpayer in Texas. Furthermore, *Sonic* and *Kmart* involved the sale of intangible property between parties physically located out of state at the time of the transaction. In this case, the transactions involved tangible personal property—computers—that were shipped to customers in New Mexico. Unlike the circumstances in *Kmart* and *Sonic*, the transactions at issue in the present case were truly *interstate* in nature. We are therefore faced with the issue of whether, under the language of the Act, New Mexico is the appropriate place of taxation of Taxpayer's cross-border transactions.

**{26}** We thus look to other jurisdictions for guidance. Many states define sale for purposes of state sales tax as the "transfer of title or possession." *See, e.g.*, Cal. Rev. & Tax. Code § 6006(a) (West 1998); Fla. Stat. Ann. § 212.02(15)(a) (West 2007); Mass. Gen. Laws Ann. ch. 64H, § 1 (West 2007); N.Y. Tax Law § 1101(b)(5) (McKinney 2006); Ohio Rev. Code Ann. § 5739.01(B)(1) (West 2007). Others specifically define a sale as the "transfer of title" alone. *See, e.g.*, Conn. Gen. Stat. Ann. § 12-407(2)(A) (West 2007). New Mexico's gross receipts tax does not limit taxation to transactions based on these specific legal or physical standards, however. The only definition of sale provided in the Act is that "selling" is "a transfer of property for consideration or the performance of service for consideration." § 7-9-3(A).

**{27}** Taxpayer urges this Court to read into the statutory definition the notion that a sale occurs where the transfer of title occurs. The Department, on the other hand, asks us to affirm the hearing officer's construction that the location of physical transfer or the location where risk of loss transfers from buyer to seller marks the location of the sale. Neither interpretation is expressly suggested by the Act's language. As a matter of statutory construction, we will not read language into a statute that is not there. *City of Deming v. Deming Firefighters Local 4521*, 2007-NMCA-069, ¶ 20, 141 N.M 686, 160 P.3d 595. Instead, we turn to the public policy behind the Act. *See Kmart*, 2006-NMSC-006, ¶ 12

7

(explaining that courts, in determining whether the legislature intended for the gross receipts tax to apply, should "examine both the purpose behind the [Act] and the statute's recent history"). **{28}** The Act is intended to "provide revenue for public purposes by levying a tax on the privilege of engaging in certain activities within New Mexico and *to protect New Mexico businessmen from the unfair competition that would otherwise result from the importation into the state of property without payment of a similar tax*." § 7-9-2 (emphasis added). Our understanding of this policy is aided by a discussion of gross receipts tax in the leading treatise on state and local taxation, which states:

> A good consumption tax should result in taxation in the jurisdiction in which consumption takes place. Taxing the sale or use of goods that cross state lines at their destination implements this principle because goods typically are consumed at their destination. Moreover, taxation by the state of destination promotes neutrality by treating all goods consumed in the state in the same way, regardless of the location from which they were shipped. Although the American retail sales tax is hardly a model of a good consumption tax, by and large it embraces the destination principle in its application to the sale of goods. "Imports" shipped from outside the state to purchasers within the state generally are subject to sales or use tax in the state of destination, and "exports" shipped from within the state to purchasers outside the state generally are exempt from sales or use tax in the state of origin.

II Jerome R. Hellerstein & Walter Hellerstein, State Taxation ¶ 18.02[1] (3d ed. 2002) (footnotes omitted).

**{29}** The "destination principle" of taxation, as articulated by the Hellerstein treatise, aligns with the policy underlying our gross receipts tax. Our gross receipts tax seeks to achieve fairness between out-of-state sellers and New Mexico sellers who sell to New Mexico customers. The destination principle furthers that policy by "promot[ing] neutrality by treating all goods consumed in the state in the same way, regardless of the location from which they were shipped." *Id.*

**{30}** Adoption of the destination principle does not require us to construe the gross receipts tax to include principles of transfer of title, transfer of possession, or risk of loss, which are concepts that were not included in the language employed by our legislature. Therefore, we hold that the destination principle applies to determine whether an interstate transaction is a taxable sale under our gross receipts tax laws. Applying this rule to the facts in this case, we conclude that Taxpayer's activities constituted taxable sales in New Mexico. The computers sold by Taxpayer had New Mexico as their destination and were, in effect, "consumed" in New Mexico.

**{31}** We are not persuaded by Taxpayer's argument that transfer of title is the triggering event. Taxpayer quotes *TPL, Inc. v. New Mexico Taxation & Revenue Department*, 2003-

8

NMSC-007, ¶ 26, 133 N.M 447, 64 P.3d 474, for the proposition that "[i]n cases involving the sale of goods, the place of transfer of title determines where the transaction is taxable." However, Taxpayer takes that quote out of context, and *TPL* does not in fact support Taxpayer's argument.

**{32}** At issue in *TPL* was whether a New Mexico company was entitled to deductions from gross receipts tax for its service of demilitarizing munitions for an out-of-state buyer of that service. *Id.* ¶ 1. Our Supreme Court held that the taxpayer had met its burden of establishing that it was entitled to the deduction because the out-of-state buyer neither made initial use of the service in New Mexico nor took delivery of the product of the service in New Mexico, as required by the applicable statute, Section 7-9-57(A), (C) (1989) (amended 1998 and 2000). *TPL*, 2003-NMSC-007, ¶ 1. Thus, unlike the circumstances in the present case, the buyer in *TPL* was located out of state, and the receipts that the Department sought to tax were for services provided by an in-state taxpayer. Essentially, the Supreme Court held that the taxpayer was entitled to the statutory deduction because the buyer had no New Mexico presence and the buyer received the benefit of the taxpayer's services the moment that the buyer shipped the munitions to the New Mexico taxpayer for demilitarization. *See id.* That is, the consumption of the services occurred out of state.

**{33}** In this case, the facts are different. The purchaser of the property sold by Taxpayer is located in New Mexico, and Taxpayer is located out of state. The language quoted by Taxpayer is taken out of context and provides no analytical support in the construction of the different statutory provisions at issue here. Therefore, the holding in *TPL* does not directly speak to the issue of whether Taxpayer's activities constitute a sale in this case.

**{34}** We are equally unpersuaded by Taxpayer's reliance on the Uniform Commercial Code (UCC) for its contention that a sale is determined when title transfers. Taxpayer points to the UCC's official commentary, which notes that "transfer of title" and "transfer of property" are interchangeable concepts, *see* NMSA 1978, § 55-2-101 cmt. (1961), and to the UCC's provision that parties may reach agreement as to when and where title transfers. NMSA 1978, § 55-2-401(1) (2005) (stating that the "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties"). Taxpayer further argues that in *Transamerica Leasing Corp. v. Bureau of Revenue*, 80 N.M. 48, 53, 450 P.2d 934, 939 (Ct. App. 1969), this Court in fact relied on the UCC definition of a sale as "the passing of title from the seller to the buyer for a price." Taxpayer's argument is misplaced, however, because the quote from *Transamerica* is dicta and because it reads the UCC out of context.

**{35}** First, the quote from *Transamerica* upon which Taxpayer relies is dicta. The Court in *Transamerica* determined that the taxpayer was not subject to gross receipts tax because it was not the seller of the goods in question, and in making this determination, the Court did not rely on the UCC definition. *See id.* (explaining that the taxpayer "was not the seller" of the goods but was instead the financing agent for the goods).

9

**{36}** Second, Taxpayer fails to note express internal limitations within the UCC. The hearing officer correctly observed that the UCC is focused on the rights of the parties to a sales contract, irrespective of "when property or title passed or was to pass." § 55-2-101 cmt. That is, according to the UCC, the point at which title passes is largely irrelevant under the UCC. Taxpayer acknowledges this inherent problem in relying on the UCC but maintains that the UCC is still informative about when a sale occurs. In defending its reliance on the UCC, Taxpayer cites to another secondary source, 1 Thomas M. Quinn, *Uniform Commercial Code Commentary & Law Digest*, § 2, at 2-784 (2d ed. 2002), to suggest that the rules on passage of title in the UCC's Article 2, while not important to the laws governing sales under the UCC, serve purposes "other than Article 2 needs," with one such purpose being to give guidance in state tax law. *Id.* § 2-401[A][4]. However, the Act does not indicate any reliance on the UCC, nor does it suggest that the definition of sale depends on the time title transfers.

**{37}** The hearing officer also correctly noted that the UCC is not intended to "override governmental or public determinations of what constitutes a sale." In response to this argument against the use of the UCC, Taxpayer contends that the hearing officer misinterpreted the Official Comment and that the UCC defines "sale" and "passage of title" in the event "the courts deem any public regulation to incorporate the defined term of the 'private' law." § 55-2-401 cmt. 1. Taxpayer's point, however, does not change the fact that the UCC, by way of its official comments, self-limits the applicability of the UCC to the specific buyer/seller/creditor issues for which it was intended. Even though the UCC defined "sale" in terms of transfer of title to assist courts interpreting the terms of private law, it does not necessarily follow that this Court *must* adopt the UCC definitions, and we see no indication that our legislature intended to incorporate the UCC's terms into the Act.

**{38}** In summary, we hold that the gross receipts tax applies in this case because, after an interstate sales transaction, the actual consumption and use of the computers occurred in New Mexico. Under our tax code, the goods in question were sold in New Mexico for purposes of imposition of the gross receipts tax.

**B.     Imposition of the Gross Receipts Tax Does Not Violate the Commerce Clause of the Federal Constitution**

**{39}** Because we hold that Taxpayer's activities constituted sales occurring in New Mexico for purposes of the gross receipts tax, we turn to the question of whether imposition of the gross receipts tax violates the Federal Constitution. The Commerce Clause authorizes Congress to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In addition to this "affirmative grant of power," courts have construed the Commerce Clause to have a "negative sweep" as well, which "prohibits certain state actions that interfere with interstate commerce." *Quill Corp. v. N.D. ex rel. Heitkamp*, 504 U.S. 298, 309 (1992).

**{40}** With respect to state taxation of out-of-state businesses conducting interstate

commerce, the United States Supreme Court set out a four-part test to determine whether a tax passes constitutional muster under the Commerce Clause in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). Under *Complete Auto*, state taxation of out-of-state businesses conducting interstate commerce will be upheld under the Commerce Clause so long as the tax (1) is fairly apportioned, (2) does not discriminate against interstate commerce, (3) is fairly related to the services provided by the taxing state, and (4) is applied to an activity with a substantial nexus with the taxing state. *Id.* at 279. Taxpayer does not argue that the gross receipts tax in the present case contravenes the first three requirements; it challenges only the existence of a substantial nexus with New Mexico.

**{41}** The concept of "substantial nexus" under Commerce Clause jurisprudence is different from the idea of nexus in the context of a due process analysis. *Quill Corp.*, 504 U.S. at 312. With respect to due process, substantial nexus relates to notions of fairness. *Id.* ("[T]he due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him."). The nexus requirement under the Commerce Clause, however, is "informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy." *Id.*

**{42}** Recognizing the framers' intent to protect interstate commerce from potentially burdensome state tax regimes, the Supreme Court protected out-of-state vendors whose only connection with the state seeking to impose taxation was the shipping of goods into the state by mail or common carrier and imposed a bright-line rule prohibiting taxation under those circumstances. *Id.* at 314-15 (explaining that this safe harbor "furthers the ends of the dormant Commerce Clause" in the hope that "burdens on interstate commerce may be avoided not only by a case-by-case evaluation of the actual burdens imposed by particular regulations or taxes, but also, in some situations, by the demarcation of a discrete realm of commercial activity that is free from interstate taxation").

**{43}** In landmark cases dealing with substantial nexus, the issue has been whether an out-of-state business itself has the required nexus with the state seeking to impose taxation. *See, e.g., Nat'l Bellas Hess, Inc. v. Dep't of Revenue*, 386 U.S. 753, 753-56 (1967). In the present case, however, we address the extent to which a third party, BancTec, can establish a substantial nexus on behalf of the out-of-state business sufficient to satisfy Commerce Clause limitations on state taxation. Under such circumstances, "the crucial factor governing nexus is whether the activities performed in this state on behalf of a taxpayer are significantly associated with the taxpayer's ability to *establish and maintain* a market in [the taxing state] for the sales." *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 250 (1987) (emphasis added) (internal quotation marks and citation omitted).

**{44}** In *Scripto, Inc. v. Carson*, 362 U.S. 207, 208 (1960), the Supreme Court upheld the imposition of a Florida sales tax on an out-of-state vendor that had no offices or employees within Florida. The out-of-state vendor, however, relied on ten Florida resident "wholesalers or jobbers" that solicited orders on behalf of the vendor. *Id.* at 209. The contract between

11

the vendor and the wholesalers specified that the wholesalers were "independent contractor[s]." *Id.* (internal quotation marks omitted). In holding that a substantial nexus existed between the vendor and the taxing state, the Court said that although the wholesalers were not regular employees of the vendor, "such a fine distinction is without constitutional significance." *Id.* at 211. The Court saw those types of contracts for out-of-state vendors as potentially ripe for abuse. "To permit such formal contractual shifts to make a constitutional difference would open the gates to a stampede of tax avoidance. Moreover, we cannot see, from a constitutional standpoint, that it was important that the agent worked for several principals." *Id.* (internal quotation marks and citations omitted).

**{45}** Similarly, in *Tyler Pipe*, the Supreme Court upheld the imposition of a Washington sales tax on an out-of-state vendor. 483 U.S. at 250. The out-of-state vendor had no office or employees in Washington. *Id.* However, by virtue of the vendor's "independent contractors" who "acted daily on behalf of [the vendor] in calling on its customers and soliciting orders," the Court held that a substantial nexus existed between the vendor and the taxing state. *Id.* at 249-50 (internal quotation marks and citation omitted).

**{46}** The hearing officer in the present case held that Taxpayer itself lacked a physical presence in New Mexico, but that the presence of BancTec established the substantial nexus and that BancTec's activities "were significantly associated with [Taxpayer's] ability to establish and maintain a market for its computer products." Thus, the hearing officer upheld the imposition of the gross receipts tax because the tax did not violate the Commerce Clause.

**{47}** On appeal, Taxpayer challenges the hearing officer's legal conclusion that Taxpayer has a substantial nexus with New Mexico. Taxpayer specifically argues that for a third party to establish substantial nexus, the third party must be engaged in sales-related activities because, Taxpayer maintains, the United States Supreme Court "has *never* held that a third-party non-agent engaged in an activity other than solicitation creates nexus." Because BancTec was not engaged in soliciting sales, Taxpayer contends that the hearing officer essentially created a new category for establishing a substantial nexus through a third party that unconstitutionally expands state taxation authority.

**{48}** We do not agree. The United States Supreme Court has not yet addressed the question of whether a third party's non-sales activities in the taxing state can constitute nexus. This absence of case law does not equate to a holding that such activities *cannot* provide nexus. We decline to reach such a conclusion because it would ignore the reality of the relationship between BancTec and Taxpayer and the critical nature of BancTec's activities to Taxpayer's business. We agree with the hearing officer that BancTec's activities helped Taxpayer "establish and maintain a market," which *Tyler Pipe* viewed as the "crucial factor governing nexus." 483 U.S. at 250 (internal quotation marks and citation omitted). As noted in the summary of the facts above and as the hearing officer specifically found, "[t]he availability of in-home service was an important factor in establishing [Taxpayer's] market for sales." "Approximately [seventy-five] percent of [Taxpayer's] New Mexico customers purchased a BancTec service contract."

**{49}** Our determination that substantial nexus exists is indirectly supported by *Dell Catalog Sales, L.P. v. Commissioner of Revenue Services*, 834 A.2d 812 (Conn. Super. Ct. 2003). In that case, the Superior Court of Connecticut considered the identical issue regarding the same taxpayer's nexus with Connecticut. *Id.* at 814. We recognize that in that case the ultimate resolution favored the taxpayer because there was a lack of evidence on the extent of the activities of the in-state service provider. 834 A.2d at 819-20 ("The missing ingredient in determining whether BancTec's on-site service established nexus in Connecticut as a representative of [the taxpayer] would be the frequency, if any, of the number of on-site service calls."). *Id.* at 822. The Connecticut court noted that "BancTec served an important need of [the taxpayer]," and that "[the taxpayer] benefitted financially from the sales of service contracts as well as the ability to have an outsourced repair service attend to the needs of its customers in Connecticut." *Id.* However, the Connecticut court had no evidence of the frequency of the service calls to determine whether BancTec's presence was "substantial," as required by *Quill*. *Dell Catalog Sales*, 834 A.2d at 822. By contrast, in the case at bar, the record establishes that Taxpayer dispatched BancTec technicians on 1,273 service calls and installation visits to New Mexico customers during the audit period. We can hardly call over one thousand service calls "isolated" or "sporadic." *Cf. In re Appeal of Intercard, Inc.*, 14 P.3d 1111, 1122 (Kan. 2000) (holding that eleven business visits made by out-of-state business to taxing state during audit period were "isolated, sporadic, and insufficient to establish substantial nexus" with taxing state when out-of-state business's contracts and sales occurred out-of-state and it had no employees or offices in taxing state).

**{50}** Our holding is also supported by the Multistate Tax Commission's position on nexus. In MTC Bulletin 95-1, the Commission stated:

> The provision of warranty repair service in the customer's state is precisely the kind of presence that squarely supports the finding of substantial nexus. The provision of in-state repair services provided by a direct marketing computer company as part of the company's standard warranty or as an option that can be separately purchased and as an advertised part of the company's sales contributes significantly to the company's ability to establish and maintain its market for computer hardware sales in the State.

10 St. Tax Notes 62 (Jan. 1, 1996).

**{51}** We therefore hold that Taxpayer, through its relationship with BancTec and BancTec's activities in New Mexico, had a substantial nexus with New Mexico, and thus, that the Department's imposition of gross receipts tax does not violate the Federal Constitution on Commerce Clause grounds.

**{52}** Taxpayer warns that this holding expands the definition of sale under the statute and the concept of substantial nexus well beyond what our legislature and the framers,

13

respectively, intended. Taxpayer also argues that our holding will cripple interstate commerce. We disagree. The Act's definition of sale is already broad enough to include interstate transactions where the property ends up in New Mexico. The limits on state taxation, as noted above, are imposed by the Federal Constitution. Our opinion today merely reflects the reality of today's modes of commerce and recognizes that Taxpayer has chosen to conduct its business in such a manner as to benefit from an in-state presence acting on its behalf, all while trying to avoid paying tax on sales to which other New Mexico businesses are subject.

## II. Assessment of Compensating Tax on Taxpayer's Distribution of Catalogs Is Valid

**{53}** We now turn to the question whether Taxpayer's distribution of catalogs designed, printed, and prepared outside New Mexico and mailed to New Mexico constitutes a taxable use of property for purposes of the compensating tax. The compensating tax, coupled with the gross receipts (sales) tax, creates a complementary consumption tax scheme, whereby sales in New Mexico are taxed under the gross receipts tax, *see* § 7-9-3.5, and purchases made out of state where the tangible property bought is then brought into New Mexico for use are subject to compensating tax. *See* § 7-9-7(A). Applying the *Kmart* framework to the compensating tax, we first consider whether Taxpayer's activities constitute a use under the statute and then turn to the constitutional issue. *Kmart*, 2006-NMSC-006, ¶ 11.

## A. Taxpayer Used Catalogs as Advertising Materials Within the Meaning of the Act

**{54}** Our first inquiry is whether Taxpayer's distribution of catalogs constitutes taxable use under the compensating tax provision of the Act. The hearing officer held that Taxpayer was liable for compensating tax on the value of the catalogs it distributed in New Mexico. Taxpayer argues that it did not use the catalogs within the statutory meaning of "use."

**{55}** We employ the same principles of statutory construction that we used in our analysis of the gross receipts tax issue to determine whether our legislature intended for the compensating tax to apply to Taxpayer's distribution of catalogs. Our compensating tax imposes a 5 percent excise tax on "the privilege of using tangible property in New Mexico . . . that was . . . acquired outside [New Mexico] as the result of a transaction that would have been subject to the gross receipts tax had it occurred within this state[.]" § 7-9-7(A)(2). "'[U]se' . . . includes use, consumption or storage other than storage for subsequent sale in the ordinary course of business or for use solely outside this state." § 7-9-3(N). This definition is quite broad and does not expressly include or exclude the distribution of advertising materials.

**{56}** Taxpayer's specific legal argument based on the statute is that it lacked physical possession and control over the catalogs, and thus, that it did not "use" them. Taxpayer points to the facts that the catalogs were created, printed, and prepared outside New Mexico

14

and mailed into the state from out of state. Taxpayer relies on *Phillips Mercantile Co. v. New Mexico Taxation & Revenue Department*, 109 N.M 487, 786 P.2d 1221 (Ct. App. 1990), to support its position.

**{57}** In *Phillips*, this Court considered whether the taxpayer, a New Mexico retailer of goods, was subject to compensating tax on the value of catalogs, mailers, and newspaper inserts that were designed and produced out of state but distributed by an Albuquerque mailing service and New Mexico newspapers with which Phillips had contracted. *Id.* at 488, 786 P.2d at 1222. The taxpayer argued that it did not use the advertising materials because it lacked physical possession and immediate control over the catalogs. *Id.* We rejected this argument, holding that the taxpayer exercised control over the distribution of the advertising materials and thus "used" them as contemplated by the compensating tax statute. *Id.* at 489, 786 P.2d at 1223.

**{58}** Taxpayer's position is that language in *Phillips* limits the application of the compensating tax to situations where the distributor of the material is located in New Mexico. Taxpayer relies on the final sentence in the following excerpt from *Phillips*.

> Phillips contends it did not use the remaining catalogs or inserts because it never had physical possession of those printed materials. Phillips offers no New Mexico authority for the proposition that 'use' requires actual physical possession and control of the property. Further, the cases Phillips relies on are distinguishable because in those cases, the in-state retailer had the advertising material shipped directly from the out-of-state seller or printer to the in-state recipient, and those materials were never in possession, in the taxing state, of a third party having a contractual relationship with the retailer.

*Id.* at 488, 786 P.2d at 1222. The language in the final sentence was not necessary to the holding in *Phillips* because it served only to distinguish case law cited by the taxpayer. Our focus in *Phillips* was on the taxpayer's control of the distribution of advertising materials, not on the location of the distributor. This is the appropriate focus for determining whether a taxpayer makes "use" of materials within the state because the purpose of the compensating tax is to ensure that tax be paid on items purchased out of state and brought into New Mexico for use in this state. *Pub. Serv. Co. of N.M. v. N.M. Taxation & Revenue Dep't*, 2007-NMCA-050, ¶ 11, 141 N.M. 520, 157 P.3d 85 ("New Mexico's compensating tax, as described in Section 7-9-7 of the . . . Act, is imposed on the buyer where property or services were acquired as the result of a transaction which was not initially subject to the gross receipts tax, but because of the buyer's subsequent use of such property or services, should have been subject to the gross receipts tax." (internal quotation marks and citation omitted)). Control of distribution in the state is therefore critical in determining whether there is use in the state.

**{59}** In this case, Taxpayer contracted for the catalogs to be designed and produced out

of state and then distributed them from outside the state to potential New Mexico customers. But Taxpayer retained the right to determine where and how the catalogs were distributed in New Mexico. This is the classic situation for which the compensating tax was designed because the compensating tax seeks to prevent the importation of goods that would have been subject to gross receipts tax had they been produced or designed in New Mexico.

**{60}** Furthermore, the policy of the Act, as mentioned above in our analysis on the gross receipts issue, is to "protect New Mexico businessmen from the unfair competition that would otherwise result from the importation into the state of property without payment of a similar tax." § 7-9-2. To allow Taxpayer in this case to escape compensating tax would entirely frustrate this policy because it would allow out-of-state businesses (with substantial nexus for Commerce Clause analysis purposes) to avoid paying tax on materials they distribute in state by using out-of-state suppliers of the advertising materials.

**{61}** Courts in other jurisdictions that have confronted the same circumstances have created several tests for determining "use." For example, in *K Mart Corp. v. South Dakota Department of Revenue*, 345 N.W.2d 55 (S.D. 1984), the South Dakota Supreme Court held that the taxpayer used advertising materials "by virtue of its ownership of the supplements and its power to determine the date of distribution and the number of copies to be distributed." *Id.* at 58; *see also Sharper Image Corp. v. Ariz. Dep't of Revenue*, 957 P.2d 1369, 1371 (Ariz. Ct. App. 1998) (holding that distribution of catalogs by third parties constituted use because the taxpayer had right or power to control distribution)*; Comm'r of Revenue v. J.C. Penney Co.*, 730 N.E.2d 266, 268 (Mass. 2000) (holding that exercise of right or power over tangible property constitutes use); *J.C. Penney Co. v. Balka*, 577 N.W.2d 283, 285 (Neb. 1998) (defining use as the exercise of any right or power over tangible property). The Idaho Supreme Court, in *K Mart Corp. v. Idaho State Tax Commission*, 727 P.2d 1147, 1149 (Idaho 1986), took a broader approach to defining the word "use." The Idaho court held that the taxpayer "used" the advertising materials "for the purpose of making sales and profits," in addition to having rights and powers over the advertising materials. *Id.*

**{62}** Taxpayer argues that we should adopt the logic in *Sharper Image Corp. v. Michigan Department of Treasury*, 550 N.W.2d 596 (Mich. Ct. App. 1996). In that case, the Michigan court narrowly construed "use" under the Michigan statute as not including distribution. *Id.* at 598. Our statute, however, is quite broad, and we interpret it consistent with the statutory presumption in favor of taxation. *See* § 7-9-8(A) ("To prevent evasion of the compensating tax . . . it is presumed that property bought or sold by any person for delivery into this state is bought or sold for a taxable use in this state.").

## B. Imposition of the Compensating Tax Does Not Violate the Commerce Clause of the Federal Constitution

**{63}** Based on our discussion above in Part I.B., we hold that Taxpayer has a substantial nexus with New Mexico, and therefore, there is no violation of the Federal Constitution by

the Department's imposition of compensating tax on Taxpayer's use of catalogs in New Mexico.

**CONCLUSION**

**{64}** For the foregoing reasons, we affirm the hearing officer's decision and order imposing gross receipts tax on Taxpayer's sales of computers and compensating tax on Taxpayer's use of catalogs and other advertising materials in New Mexico.

**{65}   IT IS SO ORDERED.**

 

_____
**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Chief Judge**

_____
**JAMES J. WECHSLER, Judge**

**Topic Index for *Dell Catalog Sales, LP v. NM Taxation & Revenue Dept*., No. 26,843**

| | |
|---|---|
| **CT** | **Constitutional Law** |
| CT-CC | Commerce Clause |
| | |
| **ST** | **Statutes** |
| ST-IP | Intrepretation |
| | |
| **TX** | **Taxation** |
| TX-CS | Compensating Tax |
| TX-GT | Gross Receipts Tax |
| TX-SN | Substantial Nexus |