**Certiorari Granted, June 22, 2012, No. 33,627**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-063**

**Filing Date: April 18, 2012**

**Docket No. 31,231**

**IN THE MATTER OF THE PROTEST**
**OF BARNESANDNOBLE.COM LLC,**

**NEW MEXICO TAXATION AND REVENUE**
**DEPARTMENT,**

> **Plaintiff-Appellant,**

**v.**

**BARNESANDNOBLE.COM LLC,**

> **Defendant-Appellee.**

**APPEAL FROM THE NEW MEXICO TAXATION AND REVENUE DEPARTMENT**
**Monica Ontiveros, Hearing Officer**

Gary K. King, Attorney General
Santa Fe, NM
Tonya Noonan Herring, Special Assistant Attorney General
Santa Fe, NM

for Appellant

Brann & Isaacson
George S. Isaacson
David W. Bertoni
Lewiston, ME

Brownstein, Hyatt, Farber & Schreck, P.C.
Timothy R. Van Valen
Albuquerque, NM

for Appellee

1

**OPINION**

**BUSTAMANTE, Judge.**

**{1}** The New Mexico Taxation and Revenue Department (Department) issued an audit assessment to Barnesandnoble.com LLC (Taxpayer) for gross receipts tax (GRT) and interest in the amount of $534,563.11 for sales into New Mexico between January 31, 1998 and July 31, 2005 (the audit period). The sole issue on appeal is whether the hearing officer correctly concluded that Taxpayer did not have a substantial nexus with New Mexico, as required under the Commerce Clause of the U.S. Constitution. Because we conclude that the in-state use of the Barnes & Noble trademarks was sufficient to meet the constitutional standard, we reverse.

## I. BACKGROUND

**{2}** After Taxpayer filed a timely protest, both parties moved for summary judgment. The facts were not disputed, and the parties agreed that the GRT statute applied to Taxpayer's activities. However, Taxpayer argued that application of the statute was unconstitutional because there was no substantial nexus between Taxpayer and New Mexico. Department argued that the GRT statute applied to Taxpayer's sales and that the presence of Barnes & Noble Booksellers, Inc. (Booksellers) stores in New Mexico created a sufficient nexus to permit the tax.

### A. Corporate Structure

**{3}** Taxpayer is a limited liability company organized under the laws of the State of Delaware "with all of its operations, facilities, and personnel located outside of the State of New Mexico." Taxpayer maintained its own offices separate from those occupied by other Barnes & Noble corporations. Taxpayer did not own or lease property in New Mexico, had no retail stores within the state, and had no sales agents or employees here.

**{4}** During the audit period, Taxpayer was at all times a wholly owned subsidiary of barnes&noble.com, inc. The ownership of barnes&noble.com, inc. varied during the period; however, at least 40% was owned by B&N.com Holding Corp. at all times. B&N.com Holding Corp. was at all relevant times a wholly owned subsidiary of Barnes & Noble, Inc. (Parent). It follows that during the audit period, Parent had an interest of between 40% and 100% in Taxpayer.

**{5}** Parent also owned several other companies relevant to our discussion. Most importantly, it owned Booksellers. Booksellers operates physical Barnes & Noble book stores throughout the United States, including three stores in New Mexico. Parent also owned Marketing Services (Minnesota) Corporation, Inc. (MSMC), which provided gift card services to Taxpayer and Booksellers.

2

**B.      In-state Activities**

**{6}**      Booksellers performed activities at its three in-state stores that Department argues created a substantial nexus between Taxpayer and New Mexico. These include the sales of gift cards, the loyalty program memberships, and a return policy that allowed Booksellers to accept Taxpayer's merchandise.

**{7}**      Both Taxpayer and Booksellers, as well as other retailers, sold Barnes & Noble gift cards. These gift cards could be redeemed either in-store or online. The gift card program was run by MSMC. When Booksellers (or any other vendor) sold a card, it received a small fee from MSMC, and it sent the proceeds from the sale to MSMC. When a card was later redeemed by a customer, MSMC credited the value of the card to the retailer who had honored it. The reverse side of the Barnes & Noble gift cards displayed the address of Taxpayer's website.

**{8}**      Taxpayer and Booksellers also sold memberships to a loyalty program called the "Readers' Advantage Program." Customers could purchase a membership in this program for $25. Membership entitled customers to discounts at Booksellers' stores and online. Fees went to Parent, who administered the loyalty program and deducted expenses from the fee income. Taxpayer and Booksellers each received a share of the remaining fees that was based on the percentage of discounts they accounted for.

**{9}**      Bookstores also implemented an expansive return policy. Customers could return salable items to Booksellers regardless of their origin. Booksellers provided in-store credit (or, equivalently, gift cards that could only be used in the stores) for such items. Customers could only return items for cash if they could produce a receipt showing that the items had been purchased in-store. Taxpayer provided information about Booksellers' return policy on its website. Taxpayer's website also provided a store locator and descriptions of in-store events.

**II.      DISCUSSION**

**{10}**      Taxpayer prevailed below based on the hearing officer's conclusion that there was not a substantial nexus between Taxpayer and the State of New Mexico. The hearing officer concluded that the activities of Booksellers "did not create and establish and maintain a market for" Taxpayer. Department contends that the decision was in error because "the activities of Booksellers, an in-state affiliate, with a physical presence in this state, helped Taxpayer create, establish[,] and maintain a market in New Mexico." Taxpayer argues that the hearing officer did not err and that imposition of the GRT would violate the Due Process Clause of the U.S. Constitution.

**{11}**      This Court will set aside the ruling of a hearing officer in a tax appeal if the ruling is found to be an abuse of discretion or if it is not in accordance with the law. *See* NMSA 1978, § 7-1-25(C) (1989). "[T]he trial court abuses discretion when it applies an incorrect

3

standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *Aragon v. Brown*, 2003-NMCA-126, ¶ 9, 134 N.M. 459, 78 P.3d 913. The sole question on appeal is whether the hearing officer correctly applied the law to the facts when it determined that there was no substantial nexus between Taxpayer and New Mexico. "[O]ur review of the application of the law to the facts is conducted de novo." *State v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209.

## A.     Commerce Clause

**{12}**    We begin with Department's argument that the hearing officer erred in concluding that no substantial nexus existed to support the assessment of GRT against Taxpayer. Department contends that a substantial nexus exists because (1) Taxpayer and Booksellers had close corporate connections, (2) Taxpaper and Booksellers used common trademarks and logos, and (3) Booksellers' in-state activities helped Taxpayer create and maintain a market in New Mexico. Taxpayer argues that it had no contact with New Mexico and that Booksellers' in-state activities should not be considered because they were not undertaken on Taxpayer's behalf.

**{13}**    Our Supreme Court has set forth a two-part analysis to determine whether the GRT applies in multi-state transactions:

> First, we must engage in statutory interpretation to determine if the Legislature intended to tax those receipts under the GRT. Second, if we conclude [in the affirmative], we must determine whether the tax violates the Commerce Clause . . . of the United States Constitution.

*Kmart Corp. v. Taxation & Revenue Dep't*, 2006-NMSC-006, ¶ 11, 139 N.M. 172, 131 P.3d 22. In the instant case, the parties have stipulated that Taxpayer sold property in New Mexico that is subject to the GRT. The sole issue on appeal is whether such a tax violates the Commerce Clause.

**{14}**    It is well settled that under the Commerce Clause, a tax may not be applied to an activity absent a substantial nexus with the taxing state. *Dell Catalog Sales L.P. v. Taxation & Revenue Dep't*, 2009-NMCA-001, ¶ 40, 145 N.M. 419, 199 P.3d 863 (citing *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977)). In *Quill Corp. v. North Dakota*, 504 U.S. 298, 317 (1992), the Supreme Court reaffirmed the bright-line rule from *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753 (1967), that a seller must have a physical presence in a state in order to satisfy the substantial nexus requirement. The physical presence requirement is met when "activities performed in this state on behalf of a taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in the taxing state for the sales." *Dell*, 2009-NMCA-001, ¶ 43 (quoting *Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 250 (1987) (alteration and emphasis omitted)).

4

**{15}** The threshold for establishing a physical presence is not high. It can result from the presence of a single employee. *See Standard Pressed Steel Co. v. Wash. Dep't of Revenue*, 419 U.S. 560, 561-64 (1975) (rejecting a commerce clause challenge to a tax on an out-of-state corporation that employed a single person in-state). It does not depend on whether the individual is classified as an employee or an independent contractor. *See Tyler Pipe Indus., Inc.*, 483 U.S. at 249-51; *Scripto, Inc. v. Carson*, 362 U.S. 207, 211 (1960) (concluding that whether in-state salesmen were independent contractors or employees was "without constitutional significance"). It can be established by the presence of in-state offices even when the activities of those offices are not related to the in-state activity being taxed. *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 561 (1977) ("[T]he relevant constitutional test to establish the requisite nexus for requiring an out-of-state seller to collect and pay the use tax is not whether the duty to collect the use tax relates to the seller's activities carried on within the [s]tate, but simply whether the facts demonstrate some definite link, some minimum connection, between the [s]tate and the person it seeks to tax." (alteration, internal quotation marks, and citation omitted)).

**{16}** This Court has had the opportunity to apply both *Scripto* and *Tyler Pipe*. In *Dell*, we addressed the question of "the extent to which a third party . . . can establish a substantial nexus on behalf of [an] out-of-state business." 2009-NMCA-001, ¶ 43. Dell took mail and internet orders for computers from its location in Texas and delivered the computers to New Mexico customers via common carrier. *Id.* ¶ 4. Dell had no property, stores, sales agents, or employees in New Mexico. *Id.* ¶ 2. However, Dell did hire a third-party corporation to service machines in New Mexico. *Id.* ¶ 7. Consumers purchased service contracts through Dell. *Id.* ¶ 8. When they needed service, they made service requests through Dell. *Id.* ¶ 9. Complaints about service were also registered through Dell. *Id.* ¶ 12.

**{17}** We began by recognizing that the Supreme Court had carved out a "safe harbor" protecting "out-of-state vendors whose only connection with the state seeking to impose taxation was the shipping of goods into the state by mail or common carrier." *Id.* ¶ 42. However, we observed that in *Scripto* and *Tyler Pipe*, the Supreme Court had held that the activities of third parties performed in-state were sufficient to create a substantial nexus. *Dell*, 2009-NMCA-001, ¶¶ 44-45. In *Dell*, technicians had been dispatched on 1273 service calls in New Mexico. *Id.* ¶ 49. The hearing officer found that the availability of in-home service was a significant factor in establishing a market for Dell sales and that about 75% of Dell's New Mexico customers had purchased a service contract. *Id.* ¶ 48. Because the service calls performed by the third-party provider on behalf of Dell helped establish and maintain a market for Dell computers, we concluded that a substantial nexus existed. *See id.* ¶ 51.

## 1. Physical Activities in State

**{18}** With these cases in mind, we proceed to Department's argument that Booksellers helped Taxpayer create and maintain a market in New Mexico. Department identifies four types of activities it alleges helped Taxpayer create and maintain a market: (1) that

5

Taxpayer "advertised Booksellers' physical locations and events happening in Booksellers' retail stores" on its website, (2) that Taxpayer discussed Booksellers' return policy on its website, (3) that both Taxpayer and Booksellers participated in a loyalty program, and (4) that both Taxpayer and Booksellers sold gift cards that could be redeemed at either business. Taxpayer argues that it had no contact with New Mexico and that none of Booksellers' in-state activities were undertaken on its behalf.

### a. Store Finder and Return Policy

{19}    We begin with the portions of Taxpayer's website allowing users to find Booksellers' stores and listing events at Booksellers' stores. We do not believe that the transmission of this information was an activity that physically occurred within the State of New Mexico. In addition, this information was not provided on behalf of Taxpayer. Instead, Taxpayer was paid to provide this information on behalf of Parent. As the website had no physical connection to New Mexico and the information was not provided on behalf of Taxpayer, it could not have contributed to the creation of a substantial nexus.

{20}    A similar analysis applies to the portion of Taxpayer's website that discussed Booksellers' return policy. The posting of this information on Taxpayer's website was not a physical activity that took place within the state. However, Department asks us to conclude that Booksellers' policy, which allowed customers to return books purchased from Taxpayer for in-store credit useable only at Booksellers, created or helped create a substantial nexus between Taxpayer and New Mexico. This we cannot do. First, the record contains no evidence that any customer ever returned a book purchased from Taxpayer to any of Booksellers' New Mexico stores. Second, Booksellers' return policy did not give preference to Taxpayer. Customers could return salable books and other merchandise regardless of where they were originally acquired. Customers returning items were given gift cards or credits usable only at Booksellers' stores. Booksellers was not obligated to return or report on books originally purchased from Taxpayer. Indeed, since no receipt was required, Booksellers generally would not have known where the books had been originally purchased.

{21}    We are not persuaded by Department's argument that the return policy in this case is analogous to *Borders Online, LLC v. State Board of Equalization*, 29 Cal. Rptr. 3d 176 (Ct. App. 2005). Unlike the instant case, the return policy in *Borders Online* treated Borders customers preferentially. *Id.* at 182. The *Borders Online* court distinguished *SFA Folio Collections, Inc. v. Tracy*, 652 N.E.2d 693 (Ohio 1995), where "returns were accepted according to the department store's own policy for its own benefit and for the convenience of its customers." *Borders Online*, 29 Cal Rptr. 3d at 191. The same distinction applies here—Booksellers accepted returns without receipts for its own benefit, not on behalf of Taxpayer or any other third party. We cannot disagree with the hearing officer's conclusion that the return policy does not establish a substantial nexus.

### b. Gift Cards

**{22}** The gift card sales present a closer question. There are two relevant scenarios. In the first scenario, customers purchase a gift card from Taxpayer and redeem it in-state at Booksellers. Taxpayer receives a fee from MSMC for selling the card and Booksellers receives from MSMC the amount redeemed from the card. This scenario does not create a nexus because Taxpayer performs no activity in-state and Booksellers' redemption of the card does not benefit Taxpayer. In the second scenario, customers purchase a card in-state from Booksellers and redeem it online from Taxpayer. Booksellers receives a fee from MSMC and Taxpayer receives from MSMC the amount redeemed. Booksellers' act of selling the gift card does result in a sale for Taxpayer, but this result is incidental. Booksellers has no control over where a gift card purchaser will redeem a card. To the extent that Booksellers can control where cards will be used, we have no doubt that it would prefer the customers to use the gift cards in one of its stores, thereby generating additional profits. Under these circumstances, we cannot say that the hearing officer abused her discretion in concluding that the gift cards did not create a substantial nexus.

### c.  Readers' Advantage Loyalty Program

**{23}** The final and most difficult issue is the loyalty program. Both Taxpayer and Booksellers sold $25 annual memberships to a loyalty program called the "Readers' Advantage Program." Members were provided discounts in stores and online. Although the record is silent on the issue, we presume that the purpose of the program was to encourage consumers, by means of a discount, to make purchases at Barnes & Noble stores and online that they would otherwise have made at competing retailers.

**{24}** The loyalty program is analogous to the gift card program, if less intuitively obvious. Like the gift cards, loyalty program discounts could be used either in-store or online. As with the gift cards, Booksellers would prefer customers to use the discounts in-store, since this would increase both sales and the amount of the post-expenses membership fees it eventually received. The two differ in one respect:  whereas the gift card created an incentive to spend the face value of the gift card at a store or online, members of the loyalty program had an incentive (the discount) to prefer Barnes & Noble over other retailers. This incentive was designed to capture sales that might otherwise have gone to other vendors, thus increasing the market for Barnes & Noble affiliates, including Taxpayer, in New Mexico.

**{25}** The loyalty program could reasonably be viewed in one of two ways. First, the hearing officer could have concluded that Booksellers' sales of loyalty program memberships did not directly produce revenues to Taxpayer by means of sales made or orders taken in-state by Booksellers. *See St. Tammany Parish Tax Collector v. Barnesandnoble.com*, 481 F. Supp. 2d 575, 581 (E.D. La. 2007) (Order and Reasons). This appears to be the course the hearing officer actually followed. **[See RP 33]** Alternatively, the hearing officer could have concluded that the effect of the program was to increase Taxpayer's sales in New Mexico. The hearing officer did not reach this conclusion. We

view this as a close question and conclude that the hearing officer could have reached either conclusion without abusing her discretion.

**{26}** Looking to all four activities, we cannot say that the hearing officer abused her discretion in concluding that there was not a substantial nexus between Taxpayer and New Mexico. Taxpayer's inclusion of a store finder on its website was not done in-state and cannot be considered. Because Booksellers' return policy was not preferential to Taxpayer, it was not done on behalf of Taxpayer. The hearing officer could have concluded either way with respect to the gift cards and the reader loyalty program; however, especially given the absence in the record of any indication of the impact of these programs on Taxpayer's sales, we conclude that there was no abuse of discretion in the hearing officer's conclusion that these programs did not create a substantial nexus between Taxpayer and the State of New Mexico.

**2.    Trademark**

**{27}** The abuse of discretion discussion does not end our analysis, for we may also reverse if the hearing officer's ruling is not in accordance with the law. Department's second argument is that Taxpayer's use of shared marketing, name recognition, and trademarks and logos created and established a market in New Mexico. Taxpayer responds that Department did not cite, nor was Taxpayer aware of, any case "finding that the use of a common or similar corporate logo created a 'substantial nexus' for an out-of-state retailer." Taxpayer also contends that Booksellers' use of the Barnes & Noble trademarks in-state was not done on behalf of Taxpayer. We conclude that, as a matter of law, the manner in which the Barnes & Noble trademarks were used by Booksellers in New Mexico was sufficient to create a substantial nexus.

**{28}** This Court has previously held that the tangible use of trademarks at stores in New Mexico is "the functional equivalent of physical presence." *Kmart Props. Inc. v. Taxation & Revenue Dep't (KPI)*, 2006-NMCA-026, ¶ 39, 139 N.M. 177, 131 P.3d 27. In *KPI*, the Kmart Corporation transferred the rights in its trademarks to a holding company in Michigan. The holding company then granted to Kmart the exclusive right to use the Kmart trademarks in the United States in return for 1.1% of Kmart's revenues. *Id.* ¶ 3. When New Mexico assessed the GRT against the holding company, the holding company protested, arguing that the assessment of the GRT against it was unconstitutional because there was no substantial nexus between it and the State of New Mexico. *Id.* ¶¶ 5-6, 10.

**{29}** We acknowledged that the holding company in *KPI* "lack[ed] the usual indicia of physical presence described in *Quill*." *KPI*, 2006-NMCA-026, ¶ 25. However, we reasoned that the physical presence requirement could be satisfied if "the nature of trademarks and [the holding company's] relationship with Kmart Corporation within New Mexico . . . constitute[d] physical presence *or its functional equivalent*." *Id.* (emphasis added). Observing that "a trademark, and its goodwill, are inseparable property rights that,

8

as a practical matter, are bound to the business that generates the goodwill," *id.* ¶ 26, we turned our attention to the close relationship between goodwill and the physical business.

> When a company acquires trademarks and goodwill, the essence of what it obtains is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to market its products. The value of what it obtains is tied to the underlying business that generates the goodwill associated with the trademarks. If there is no business and no good will, a trademark symbolizes nothing. Goodwill is bound to the business with which it is associated, and can no more be separated from a business than reputation from a person.

*Id.* ¶ 27 (internal quotation marks and citations omitted).

**{30}** Given the facts in *KPI* and the close relationship between goodwill and conducting business, we concluded that Kmart Corporation and the holding company were "corporate 'Siamese Twins,' inextricably bound to each other." *Id.* ¶ 28. The holding corporation needed access to the physical stores to maintain the goodwill behind its trademarks, and the stores needed to use the trademarks to differentiate themselves from other general merchandising stores. *Id.* Furthermore, "Kmart customers . . . had no way of knowing that they were dealing with representatives of [the holding company's] goodwill; apparently few people were actually aware that [the holding company], and not Kmart Corporation, owned the [trademarks] and associated goodwill." *Id.* ¶ 30. The nature of trademarks meant that the two could not be separated. We therefore concluded that the combination of Kmart Corporation's stores in New Mexico and the tangible presence in New Mexico of the trademarks owned by the holding company was "the functional equivalent of physical presence as afforded by the independent representatives in *Scripto* and *Tyler Pipe*" and that the imposition of the GRT on the out-of-state holding company was constitutionally sound. *See KPI*, 2006-NMCA-026, ¶ 39.

**{31}** Our Supreme Court ultimately reversed our opinion in *KPI*, concluding that the GRT statute did not apply to the licensing transaction at issue in that case. Given the statutory basis for its decision, the Supreme Court did not find it necessary to reach the constitutional question. Nevertheless, we regard then-Judge Bosson's analysis of the constitutional issues as persuasive. As we discuss below, pursuant to Judge Bosson's reasoning in *KPI*, Booksellers' in-state activities performed under the banner of the Barnes & Noble trademarks were sufficient to create a nexus between Booksellers and College Bookstores, the owner of the trademarks. In the instant case, however, we must go one step further, and decide whether Department may impute the in-state activities of one licensee (Booksellers) of the Barnes & Noble trademarks to another licensee (Taxpayer) who used the Barnes & Noble trademarks to make internet sales to residents of New Mexico.

9

**{32}**     We begin with the most obvious in-state activity:  Booksellers' operation of three stores in New Mexico.  As in *KPI*, Booksellers' in-state activities of running retail stores strengthened the goodwill behind the Barnes & Noble trademarks.  Booksellers used the Barnes & Noble trademarks on and in its stores.  By doing so, Booksellers personified the goodwill owned by College Bookstores and facilitated sales in New Mexico.  *See id.* ¶ 30.  Under the reasoning of *Kmart*, this activity cannot be separated from College Bookstores' ownership of the trademarks.

**{33}**     Because consumers expect to be able to find businesses on the internet, some of this goodwill inevitably accrues to Taxpayer.  "[C]onsumers increasingly rely [on goodwill] to locate the true source of genuine goods and services on the Internet."  S. Rep. No. 106-140, at 5 (1999).  Booksellers' customers "had no way of knowing that they were dealing with representatives of [College Bookstore's] goodwill," *KPI*, 2006-NMCA-026, ¶ 30, or that different corporate entities represented the goodwill of College Bookstore's Barnes & Noble trademarks on the internet and in physical stores.  In fact, consumers saw only one entity:  Barnes & Noble.  Just as the goodwill generated by in-state business in *KPI* could not be separated from ownership of those trademarks, we believe that it is not possible to separate the goodwill generated by Booksellers' in-state stores into physical and internet components.

**{34}**     In addition to the vicarious accrual of goodwill to Taxpayer by virtue of Booksellers' stores in New Mexico, additional activities at the physical stores directly increased goodwill for Taxpayer's website.  As noted above, the stores sold and accepted gift cards displaying the Barnes & Noble trademarks.  These cards indicated that they could be redeemed at either the physical stores or through the Barnes & Noble website.  Similarly, the stores sold and honored Readers' Advantage memberships.  The memberships entitled customers to discounts at the stores and at the Barnes & Noble website.  We have decided that these activities standing alone do not create a sufficient nexus.  But viewing them as cross-marketing activities performed at in-state stores and explicitly mentioning the Barnes & Noble website—in the context of creating and enhancing goodwill not only for the Barnes & Noble trademarks but explicitly for Taxpayer's web business—they are probative.

**{35}**     By licensing the trademarks to Taxpayer and Booksellers, College Bookstores was in effect telling customers to consider Taxpayers and Booksellers to be one and the same.  The goodwill developed both directly, by in-store activities promoting Taxpayer's website, and indirectly, by consumers' increased awareness of Barnes & Noble due to the presence of in-state stores, helped to establish and maintain a market in New Mexico for Taxpayer.  This created a substantial nexus between Taxpayer and New Mexico sufficient to support the imposition of the GRT.

**B.      Due Process and the State Rules Act**

**{35}** Taxpayer asserts that even if the GRT is constitutional as applied in this case, imposition would nevertheless violate its due process rights and would violate the state rules act. This argument has no merit.

**{36}** Throughout this litigation, Taxpayer's position has been that it was not required to pay the GRT because the constitutional requirement of substantial nexus between it and New Mexico was not met. As the hearing officer noted, "[i]f 'substantial nexus' is found, . . . Department and Taxpayer have stipulated that there were net taxable sales of property in New Mexico . . . and gross receipts tax would be due on the sales." Taxpayer can hardly stipulate that the GRT applies and then argue that it was not clear that the GRT applied. And although Taxpayer has cited cases for the proposition that vague statutes and rules may violate due process, *see Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 145-46 (1936), it has pointed to no authority suggesting that due process is violated when a question of constitutional law is resolved against it.

**{37}** Taxpayer also suggests that the state rules act bars Department from applying the GRT against it. The basis for this argument is the assertion that "[w]hen an agency seeks to expand the reach of a statute to situations that are not reasonably apparent from its terms, it *must* engage in rulemaking." However, Taxpayer provides no authority to support this assertion. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that absent cited authority to support an argument, we assume no such authority exists.). We therefore decline to address this argument.

## III.    CONCLUSION

**{38}** For the foregoing reasons, we reverse the order granting summary judgment and remand for further proceedings consistent with this Opinion.

**{39}    IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index**

11

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Appeal
 Rules

**COMMERCIAL LAW**
Trademarks and Copyright

**CONSTITUTIONAL LAW**
Commerce Clause
Due Process

**TAXATION**
Gross Receipts Tax
Substantial Nexus